James **HART,** Appellant,

v.

**UNITED STATES,** Appellee.

No. 85–1234.

District of Columbia Court of Appeals.

Argued Dec. 18, 1986.
Decided March 9, 1988.

---

Thomas T. Heslep, Washington, D.C., appointed by this court, for appellant.

Elizabeth Trosman, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and William M. Jackson, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before MACK, NEWMAN and ROGERS, Associate Judges.

NEWMAN, Associate Judge:

Hart was convicted of first-degree burglary while armed, first degree theft and unauthorized use of a motor vehicle. He contends his convictions must be reversed because the trial court violated his sixth amendment right by limits placed upon cross-examination of the complaining witness and that prosecutorial misconduct in closing argument deprived him of a fair trial. We affirm the convictions of burglary while armed and first-degree theft; the government concedes that the conviction for unauthorized use of a motor vehicle merges with the first-degree theft conviction. *See Arnold v. United States,* 467 A.2d 136, 138–39 (D.C.1983). So much of the judgment of the trial court as pertains to unauthorized use of a motor vehicle is reversed.

According to the testimony of complaining witness Hall, he and appellant James Hart first became acquainted with each other a week or two before June 13, 1984. Hall testified that Hart approached him after noticing Department of Defense tags on his car. Hart, who called himself "Tan," said he was from out-of-town, and asked for assistance in obtaining a government job. Hall gave Hart a ride and invited Hart to stop by his apartment at a later date to pick up a 171 form. This transpired a few days later when, according to Hall, Hart came up to his apartment for about 20 minutes.

On June 13, 1984, Hall was awakened at 1:30 a.m. by a knock at his door. As he began to open the door, Hart and another unknown person forced their way into the apartment. Then, according to Hall, the assailants held a knife to him, bound him to a mattress in the living room, and removed a gold ring from his finger. They began to pack up Hall's electronic equipment—stereio, VCR, television, computer, telephone—into the original boxes. Eventually Hall was transported into the bedroom where, he testified, the two burglars attempted to force whiskey down his throat, stuffed a pillowcase into his mouth, bound him face down on the bed, and kicked him.

Hall managed to untie himself while the intruders were still present in the apartment. Hall testified that he first attempted to phone police and the front desk of his building, but after receiving no response, decided to call his neighbor Smith who was successful in calling the police. Smith tes-

tified to receiving the call from Hall at about 2:30 a.m. and summoning the police.

At about 3:30 a.m. Hall emerged from the bedroom and observed that keys to his apartment, office, and car were missing. He also noticed by looking out the window that his car was gone. In addition, he observed the electronic equipment packed in the living room, along with several garment bags stacked in the living room. Hall soon received a telephone call from a person whose voice he recognized as Hart's demanding $1000 in exchange for Hart's not wrecking the car. Hart also threatened that if Hall reported the burglary to police, Hart would publicly accuse Hall of having a homosexual relationship with him. Hall received several similar calls over the course of a few hours (and at later times as well). Several hours later Hart was arrested driving Hall's car and wearing Hall's monogrammed shorts. Inside the car were a video camera, a garment bag with clothing, and some cash, all of which Hall testified had been stolen from his apartment the previous evening.

Hall's neighbor Smith and police officers who had responded to the scene testified that the apartment appeared to have been ransacked and that Hall was in a very upset condition. Fingerprints matching Hart's were recovered from many items in Hall's apartment.

Hart testified in his own defense that the relationship between Hall and himself was of a different character than Hall had described, that he had not forced his way into Hall's apartment at knifepoint, that he had arrived alone to visit Hall, and did not steal anything from him. According to Hart, it was Hall who had first approached Hart several weeks before the incident on June 13. Hart testified that he had visited in Hall's apartment a number of times, and that Hall permitted him to borrow his car on one occasion before June 13.

Also, according to Hart, Hall had made sexual overtures to him. On the evening of June 12, testified Hart, Hall insinuated that he would pay Hart for sex, and also showed Hart a videotape of Hall and another man having sex. Hart refused Hall's sexual advances that evening and headed for the door. A struggle ensued in which Hall ripped off Hart's pants. Hall gave Hart the monogrammed shorts and the keys to his car, telling Hart that he could drive around until morning. Hart also testified that Hall promised to buy him a moped and other items if Hart would not reveal Hall's homosexuality.

## I.

Hart argues that the trial court unconstitutionally limited his right to confront witnesses when, after a proffer from defense counsel, the court sustained the government's objection to an attempt to cross-examine complaining witness Hall about the contents of a wallet which had been left undisturbed by the burglars. The government objected when defense counsel asked Hall "What kind of credit cards do you have, sir?"

According to the defense proffer, reasserted on appeal, counsel intended to present evidence that Hart had knowledge of the contents of the wallet and other details about Hall's personal life. This knowledge, argues Hart, would have supported the defense version of the case, i.e., that Hart and Hall were quite familiar with each other prior to the events of June 13, and would have thereby undercut the credibility of Hall's testimony and of the government's fingerprint evidence.

The trial court sustained the government's objection on the grounds that the proposed cross-examination was beyond the scope of direct examination, and was not pertinent to any issue in the case at the time. The court also reminded defense counsel that the complaining witness would remain available to be called by the defense as part of its case-in-chief—an opportunity that the defense did not take advantage of.

In the District of Columbia, the reach of cross-examination is delimited by the scope of direct examination. Therefore, the trial court should permit cross-examination to explore any matters which tend to contradict, modify, or explain testimony given on direct. *Morris v. United*

*States*, 398 A.2d 333, 339 (D.C.1978). Other matters are properly left to the opposing party's case-in-chief. *Waller v. United States*, 389 A.2d 801, 810–11 (D.C.1978) (noting that defense could have recalled witness for direct examination and that failure to do so is inconsistent with assertions of prejudice on appeal); *Baker v. United States*, 131 U.S.App.D.C. 7, 36, 401 F.2d 958, 987 (1968) (cross-examination properly denied where matter sought to be explored was in the nature of an affirmative defense). In this case, the matter of Hall's ownership of credit cards was in no way raised by his testimony on direct examination. The trial court appropriately curtailed the cross-examination, leaving the defense the opportunity to portray the purported familiarity between Hall and his alleged assailant during its case-in-chief.

## II.

Hart's other argument on appeal is that the prosecutor's remarks during closing and rebuttal arguments substantially prejudiced his trial, requiring this court to reverse his convictions. Principally, Hart complains that the prosecutor suggested that the defendant's testimony was fabricated, that his presence at trial had permitted this fabrication, and that the prosecutor used inflammatory language to appeal to the jury's emotions and to suggest reasons for conviction apart from the evidence in the case. The government responds that the prosecutor's remarks were not misconduct, that defense counsel failed to object contemporaneously to many of the statements complained about on appeal, that defense counsel either requested no curative measure or acquiesced in that given, and finally, that even reviewing under a "substantial prejudice" rather than a "plain error" standard, no reversible error occurred.

In his rebuttal argument the prosecutor made certain statements, which, Hart argues, suggested that Hart's testimony was fabricated. These remarks included asking the jury, "Does that appear ridiculous?" and stating that "the most amazing thing happened ... during the course of Mr. Hart's testimony. He started rapping and telling the story ... [j]ust popping into his head as he was going along...." At this point, defense counsel objected and, at the bench, the judge admonished the prosecutor "[m]aybe it's not proper for you to suggest whether it is fabricated. They will have to decide that." Then the judge asked, "Are you satisfied he is admonished not to suggest that it is something that popped into his head?" Defense counsel replied "Okay." Shortly thereafter, the prosecutor told the jury "He sits there and then he says the most incredible thing." He then asked the jury, "Does that make any sense?" and later, "Does that sound like a person telling the truth? Gets on the stand and tells the truth? You will have to decide that." Finally, the prosecutor asked the jury, "Would you bank on that story?" suggesting, says Hart, that his testimony may have been based on having heard the other evidence.

 The prosecutor's comments here seem to lie somewhere between "[c]haracterizing testimony as incredible ... an accepted and proper form of comment on contradictory testimony." *Dyson v. United States*, 418 A.2d 127, 130 (D.C.1980), and the impermissible expression of the prosecutor's personal opinion as to the veracity of witnesses. *Id.* at 130. Ordinarily in cases in which this court has held that the prosecutor's remarks amounted to an expression of opinion about witness veracity, the prosecutor has explicitly referred to the testimony as "lying" "filled with falsehood," *id.* at 130, "false," "just outright perjury," *Miller v. United States*, 444 A.2d 13, 14 (D.C.1982), or "total outright fabrication," *Jenkins v. United States*, 374 A.2d 581, 584 (D.C.1977). Nevertheless, the likely inference from the prosecutor's remarks in this case was that he believed that Hart's testimony was fabricated. The inference is especially troubling because of his reference to Hart's listening to other testimony at trial. Drawing on adverse inference from the defendant's exercise of his constitutional right to confront witnesses is impermissible, *Fornah v. United States*, 460 A.2d 556, 560–61 (D.C.1983); *Dyson, supra*, 418 A.2d at 131. We think, in sum, the government's argument transgressed the line into impropriety.

In addition to suggesting that Hart's testimony was a fabrication, Hart contends the prosecutor also used language to suggest a basis for conviction aside from the evidence of the crimes charged. In his closing argument, the prosecutor asked the jury to "return a verdict of guilty in this particular case for everything that man did. Everything he did: brutalizing and terrorizing that man and stealing his stuff." In rebuttal, he again referred to the complaining witness having been "brutalized, terrorized, victimized over a period of hours." (Hart had not been charged with assault or any similar offense.) Furthermore, more than once the prosecutor referred to the fact that Hall lived alone, and was therefore susceptible to Hart's attempt to "smear" his sexual reputation. The prosecutor told the jury "And you don't make a victim a criminal. You don't make a victim and tell them—and smear a victim, and all the smears in the world will not take away from what he did to this man on that night." Thereupon, defense counsel objected and asked for a curative instruction. The court told the jury, "Let me just remind the jury that, of course, you will decide the case without any passion, solely from a consideration of the evidence, and, again, the argument of the attorneys are not evidence in the case." Later, as part of the standard jury instructions, the jurors were again told that the statements and arguments of the attorneys are not evidence, and that their own recollection of the evidence is what controls.

Prosecutorial remarks that seek to arouse the sympathy of the jurors for the victim are improper. *Powell v. United States*, 455 A.2d 405, 410 (D.C.1982). In this case, the prosecutor's characterization of the events as "brutalizing" and "terrorizing" the victim could be said to be supported by the victim's testimony and thus not "speculative," *id.* at 410; nevertheless, these aspects of the crime (i.e. physical

assault) were not elements of the offenses charged. By asking the jury to convict "for everything that man did," we think the prosecutor again transgressed the line into impropriety by appealing to the jury to render a verdict based upon a larger policy, and upon their own fears of being victimized, rather than on the evidence in the case. *See id.* at 410 (prosecutor improperly appealed to juror's fears of violence and asked them to "send a message" that the community doesn't tolerate robberies).

In evaluating whether prosecutorial misconduct creates "substantial prejudice" requiring reversal, this court must consider the closeness of the case, the centrality of the issue, and the steps taken to mitigate prejudice. *Dyson, supra*, 418 A.2d at 132.[1] The defendant's credibility in this case was central. Furthermore, curative instructions did not extend much beyond the standard reminder to jurors that the arguments of the attorneys are not evidence. Nevertheless, we find no basis for reversal in this case because of the weight of the government's evidence against Hart. The government's case was based not only upon Hall's own testimony, but also upon the corroborative testimony of his neighbor Smith and the police officers who responded to Hall's apartment shortly after the burglary. *Cf. id.* at 132 (reversing for prosecutorial misconduct where the government's case consisted solely of circumstantial evidence). The prosecution's evidence in this case significantly outweighed Hart's version of the events, so that we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* at 132.

*Affirmed in part; reversed in part; remanded for further proceedings consistent with this opinion.*

1. The defendant objected to some of the prosecutor's conduct which he assigns as error on appeal; he did not object to the balance. As to at least one of his objections, he expressed satisfaction with the curative action taken by the court. Rather than attempt to parse the issue

with respect to our measure of review between plain error or harmless error, solely for the sake of simplicity (since the results would be no different), in this case we elect to apply the *Dyson* harmless error test.