**Florencio COREAS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 87–1166.

District of Columbia Court of Appeals.

Argued May 25, 1989.
Decided Oct. 24, 1989.

---

Daniel E. Ellenbogen, Kensington, Md., for appellant.

Thomas J. Tourish, Jr., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed, and Elizabeth Trosman, Washington, D.C., and Patricia A. Broder-

ick, Asst. U.S. Attys., were on the brief for appellee.

Before MACK[1], NEWMAN and SCHWELB, Associate Judges.

NEWMAN, Associate Judge:

Appellant was convicted of voluntary manslaughter while armed and of carrying a pistol without a license. On appeal, he urges three grounds for reversal. Specifically, he argues: 1) that the trial court erred in failing to reinstruct on self-defense, despite its reinstruction on second degree murder and voluntary manslaughter; 2) that the prosecutor engaged in various acts of misconduct including "sandbagging," mischaracterizing the evidence, arguing facts not in evidence, impermissibly commenting on Coreas' credibility including that Coreas set up two of his defense witnesses, arguing adverse inferences from Coreas' exercise of his sixth amendment right to confront witness, urging the jury to "send a message" with its verdict and appealing to the passions and sympathy of the jury; and 3) that insufficient evidence existed to sustain the conviction. We address the first two arguments[2] and reverse on the second. We hold that the cumulative effect of the prosecutorial misconduct rises to the level of plain error.

## I.

On the afternoon of March 30, 1982, Apoliano ("Polo") Perez, an immigrant to this country from El Salvador, was fatally wounded when he entered his apartment building upon returning from work with Gustavo Dell' Acqua, who had paid Perez $10.00 to help him clean an apartment. Perez, who was carrying a mop and bucket, stopped briefly at a store before returning home, while Dell' Acqua continued on. Soon after Dell' Acqua returned to his apartment, he heard the sound of gunfire and went out into the lobby to investigate. He saw no one in the lobby but when he looked over the staircase leading down to the basement he saw Perez's body lying at the foot of the steps. Perez's head and shoulders rested on the basement floor, while his torso and legs ascended the stairs. The bag which Dell' Acqua had seen Perez carrying when they returned from work was still under his left arm. He also observed Perez's mop and pail sitting near the top of the stairs; he saw no gun. Dell' Acqua testified that he had seen Perez in the apartment building the previous day walking down the stairs to visit friends in a basement apartment.

The homicide detective who was called to the crime scene testified that he found no defensive wounds on Perez's body. The detective examined the contents of the bag still tucked under Perez's arm and found a pair of shoes, two broken light bulbs, a dead bolt lock and a box of nails. He also observed a knife with a long blade tucked in to Perez's unbelted waistband, with the blade portion of the knife sticking up. Despite his apparent fall, the knife had neither torn Perez's shirt nor cut him.

Another officer who sketched and photographed the crime scene recovered two twenty-two caliber bullets, one from the first step leading down to the basement and the other in the lobby, near the steps to the basement.

The following day, Dr. Douglas S. Dixon, then Deputy Medical Examiner in the District of Columbia, performed an autopsy on Perez's body. Dixon was no longer at the Medical Examiner's Office at the time of the trial so Dr. Carol Lynn McMahon, also a Deputy Medical Examiner, testified at trial and summarized the findings in Dr. Dixon's autopsy report, which was admitted into evidence.

The medical evidence indicated that Perez was shot five times. Three bullets entered his arm, one entered his back and one entered his leg. The autopsy report labeled the gunshot wounds "A" through "E," without indicating the order in which

---

1. Judge Mack was an Associate Judge of this court at the time of argument. Her status changed to Associate Judge, Retired, on October 1, 1989.

2. Although this case was extremely close on the issue of self-defense, we find Coreas' argument that insufficient evidence existed meritless.

the bullets entered Perez's body. The report recorded the direction of the bullets once inside the body, the angle in which they entered and the internal organs that were affected.[3] At the time of his death, Perez was wearing a striped shirt, with a dark shirt underneath. At trial, it was revealed that the striped shirt which was originally taken into custody was missing. Apparently no test had been performed on the shirt before it was lost. Therefore, the medical examiner could not make any predictions as to how far Perez was from his attacker when the four shots entered Perez's upper body.[4] Additionally, Dr. McMahon stated that she could not determine the trajectory of the bullets, that is whether the gun was aimed from above or below Perez, because she had no way of knowing the relative positions of the gun and the body. Finally, although the autopsy report contained no evidence or analysis about the order of the bullets, Dr. McMahon attempted to hypothesize about the order at trial. At one point, she stated that the three shots to the arm came first; then she stated it was possible that the shot to the leg came first. Finally, however, she admitted that she could not testify as to the order of the bullets with reasonable scientific certainty.

Appellant, Florencio Coreas, also an immigrant to this country from El Salvador, surrendered himself to the police the next day and admitted that he had shot Perez in self-defense. He testified at trial; there were no other witnesses to the shooting.

Coreas testified that Perez had threatened him in the past and that he was afraid of Perez. Specifically, Coreas testified that he had heard that Perez had killed his brother and that Perez "had a gun and he wanted to kill [Coreas]". (Tr. 551). On one occasion, according to Coreas, he was with two friends on the street when Perez "stopped and said that he wanted to kill me there.... [B]ut the person who was with [Perez] said not to do it there because I was in the middle of other persons and he continued walking." (Tr. 552).[5]

On the day of the incident, Coreas claimed that when he returned home from work he encountered Perez in the lobby.[6] Coreas testified that Perez, "took out the gun and threatened" him. According to Coreas, he tried to grab Perez's hand, they

---

**3.** According to Dr. McMahon's summary of the autopsy report, gunshot wounds A, B and C all entered the left upper arm. Gunshot wound A entered the arm and without exiting the arm, proceeded into the left side of the chest, where it perforated the upper lobe of the left lung and lodged in the soft tissue in front of the breastbone. Dr. McMahon testified that this wound could have been fatal and "hypothesized" that the arm was slightly raised when the bullet entered it. Gunshot wound B entered and exited the arm and then reentered the chest, traversed the lower lobe of the left lung, perforated the pericardial sac and then lodged in the soft tissue of the chest above the right nipple. Dr. McMahon stated that this wound was fatal and probably entered as the left arm was pressed against the chest. Gunshot wound C entered and exited the arm without touching the bone. Gunshot wound D, which was disabling but not necessarily fatal, entered Perez's back severing the spinal cord. According to Dr. McMahon, gunshot wound D would have left the "decedent immediately disabled with respect to being able to move his lower extremities." Wound E entered the body at mid thigh and passed straight up through the soft tissues into the pelvis.

**4.** "Stipling" refers to the particles of gunpowder deposited on the skin and is used to indicate the range between the muzzle of the gun and the body. As Dr. McMahon testified, "If a person is clothed or the area of the body is wounded and covered by clothing, the clothing filters [the stipling] out. So we examine the clothing for that." (Tr. 309). Also, she indicated that the absence of stipling or gunpowder on clothing means that the gun was greater than eighteen inches away from the body.

**5.** Metropolitan Police Officer Ayala, who had advised Coreas to turn himself in to the police, also testified that Perez "was supposed to have been armed and had problems with looking for Coreas." (Tr. 386–87). Ayala, however, had never seen Perez with a gun. Similarly, Perez's brother testified that he had never seen his brother with a gun and that as far as he knew, his brother did not know how to shoot a gun.

**6.** That same day Pedro Gomez, who knew Coreas, was visiting his uncle who lived in the apartment building. Upon entering the building at 5:00 or 5:30, he encountered a "suspicious-looking" man with "bad intentions." Gomez stated that when the man saw him, he brandished a knife, but when he realized he "didn't have anything" with Gomez, he lifted his shirt to replace the knife. As he did so, Gomez saw a gun tucked into the man's waistband.

fell to the floor where the two men struggled and Coreas was able to wrest the gun from Perez. At that point, Coreas stood up and moved towards the wall. As Perez came toward Coreas, Coreas started to shoot, and Perez "started staggering and fell down the stairs to the basement of the building." Coreas claimed that he "became very scared and ran upstairs to [his] apartment and out the window and down a fire escape." He testified that he left the pistol on the lobby floor at the top of the basement stairwell, although the police did not find the gun when they arrived at the crime scene. Finally, Coreas stated that although he never saw or felt a knife, he discovered later that his arm had been cut during the struggle. Coreas did not tell the arresting officer about his wounds. Photographs of his injuries were admitted into evidence.

In the government's closing argument, the prosecutor primarily attempted to show that the evidence surrounding the killing was inconsistent with Coreas' version of events: that he had struggled with Perez to defend himself and had wrested control over Perez's gun. The prosecutor focused on the fact that Dell' Acqua had not heard any scuffle before he heard the gunshots; that the bag he had earlier seen Perez carrying was still underneath Perez's arm as he lay at the bottom of the steps; that the knife lodged in Perez's unbelted waistband had not cut his skin or his shirt; that if a fight had ensued Perez would have used his knife and that Coreas had not been injured in the alleged altercation.

During the remainder of its initial closing argument, the government discussed the autopsy report, highlighting the testimony of Dr. McMahon, the medical examiner who did not actually perform the autopsy, but who testified at trial as to the contents of the report. The prosecutor discussed the five wounds, the trajectory of the bullets *within* Perez's body, and the damage sustained by the organs and tissues. The prosecutor did not allege that Coreas was lying in wait at the bottom of the stairs or articulate a scenario of the events consistent with such a theory (*i.e.*, the outward trajectory of the bullets, the effect of the

bullets on Perez's movements or the relative positions of the decedent and Coreas during the altercation).

The defense then presented its closing argument, claiming essentially that Coreas had shot Perez in self defense, out of fear and during an armed struggle. The defense noted that based on the autopsy report and the medical examiner's testimony it was impossible to determine how far apart the two men stood or the trajectory of the bullets.

The government then delivered its rebuttal argument. It articulated a new theory of the case in which Coreas was lying in wait at the basement steps for Perez to appear. In so arguing, the government offered a complete explanation of the order, effect, trajectory and firing distance of the bullets which entered Perez, as well as the relative positions of Coreas and Perez during the shooting. No objection was made during rebuttal, however, two days later the defense moved for a mistrial in the middle of jury deliberations. The motion was denied.

On the third day of deliberations, after having sent the trial judge a note the previous day indicating that it was unable to reach a unanimous verdict (and being asked by the trial judge to continue deliberations), the jury sent the judge a note indicating its confusion on second degree murder and voluntary manslaughter. Before reinstruction on those charges, the defendant requested that the court also reinstruct on self-defense. The court indicated initially that it would include a reference to self-defense during reinstruction, as an element of the crimes of voluntary manslaughter and second degree murder, but thereafter changed its mind and did not reinstruct on self defense. The jury returned its verdict within thirty minutes of reinstruction.

## II.

### Reinstruction of the jury

Once again, this court is asked to revisit the law governing the reinstruction of the jury. Coreas contends that the trial court

erred when, in response to a note from the jury asking to be reinstructed on second degree murder and voluntary manslaughter, the trial court refused to reinstruct on self-defense.

Decisions regarding whether and how to reinstruct the jury are committed to the broad discretion of the trial court. *Davis v. United States*, 510 A.2d 1051, 1052–53 (D.C.1986) (per curiam) (citing *Tyler v. United States*, 495 A.2d 1180, 1183 (D.C. 1985); *Bedney v. United States*, 471 A.2d 1022, 1024 (D.C.1984); *Shreeves v. United States*, 395 A.2d 774, 787 (D.C.1978), *cert. denied*, 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979); *Murray v. District of Columbia*, 358 A.2d 651, 653 (D.C.1976)); *Potter v. United States*, 534 A.2d 943, 946 (D.C.1987) (per curiam); *see also* AMERICAN BAR ASSOCIATION STANDARDS FOR CRIMINAL JUSTICE § 15–4.3 (Trial by Jury) (1980); E. DEVITT & C. BLACKMAR, FEDERAL JURY PRACTICE AND INSTRUCTIONS § 5.21 (3d ed. 1977). In this case the trial court erred by applying the wrong standard to its exercise of discretion.

Initially, the trial court decided to give the reinstruction on self-defense. The government objected and opined, without citation, that "[w]hen the jury asks for a specific instruction the court should not vary from that instruction but should give it as is. That is the government's position." The jury was then reinstructed. In an apparent about-face, the trial judge decided not to reinstruct on self-defense based on the mistaken impression that "there existed a case which would indicate that the instruction should not be modified." [7]

Since we reverse on other grounds, we do not decide whether this erroneous exercise of discretion constitutes an "abuse of discretion." *See Johnson v. United States*, 398 A.2d 354, 363 (D.C.1979). We reemphasize, however, that when the trial court gives supplemental jury instructions it should seek not only to respond to the jury's request as the court in its discretion sees fit, but it should do so in a manner that does not unduly emphasize one aspect of the case. When the reinstructions refer only to the elements that compose the offense or offenses charged, the jury may be unduly persuaded by what it has heard the trial judge instruct upon last. *Davis, supra,* 510 A.2d at 1053; *see, e.g., Bollenbach v. United States*, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946) ("the judge's last word is apt to be the decisive word."); *Tart v. McGann*, 697 F.2d 75, 77 (2d Cir.1982) (trial court " 'must exercise special care to see that inaccuracy or imbalance in supplemental instructions do not poison an otherwise healthy trial.' ") (quoting *United States v. Carter*, 491 F.2d 625, 633 (5th Cir.1974)); *Perez v. United States*, 297 F.2d 12, 16 (5th Cir.1961) (when reinstructing jurors, the "underlying search" in determining which instruction to give is "whether the charge taken as a whole was such as to confuse or leave an erroneous impression in the minds of the jurors.").

At a minimum, the trial judge should strive during reinstruction to achieve "the ideal of a neutral, balanced instruction." *Davis, supra,* 510 A.2d at 1053. "The mere insertion in the standardized instruction of the phrase 'such as when he [or she] acts in self-defense' ... would obviate any concern that the jury might not understand or recall that, once raised, self-defense is an element of homicide [or second degree murder or voluntary manslaughter, as in this case] that must be disproved by the government beyond a reasonable doubt." *Id.* (citations omitted).

### Prosecutorial misconduct

Coreas next argues that the government committed various acts of prosecutorial misconduct. Specifically, he asserts that he was "sandbagged" when the govern-

---

**7.** After a brief recess and following jury reinstruction, defense counsel formally objected to the reinstruction, and called the *Davis* case to the court's attention. After listening to defense counsel recite relevant portions of the case, the court chastised defense counsel for making her point too late. Defense counsel stated that she would have acted sooner but that given the court's initial ruling, she was under the impression that the court had intended to reinstruct on self-defense.

ment argued in rebuttal that Coreas was lying in wait for Perez to return home from work, a theory of the case that the government did not develop in its initial closing;[8] that the prosecutor argued facts not in evidence and mis-characterized evidence to support this theory; that the prosecutor impermissibly impugned Coreas' credibility by asserting that he told "untruths" and "set-up" two defense witnesses to testify in his favor; that the prosecutor impermissibly argued adverse inferences from Coreas' sixth amendment right to confront witnesses; that the prosecutor impermissibly urged the jury to "send a message" to the defendant with the verdict; and appealed to national bias in an effort to arouse the jury's passions and prejudices.

■ In analyzing claims of alleged prosecutorial misconduct, we must first determine whether the prosecutor's actions were improper. *Jones v. United States,* 512 A.2d 253, 257 (D.C.1986). If misconduct has occurred we then must determine whether "substantial prejudice" resulted. *Powell v. United States,* 455 A.2d 405, 411 (D.C.1982); *(Duane) Dyson v. United States,* 450 A.2d 432, 437 (D.C.1982). The decisive factors determinative of whether there has been substantial prejudice include "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Powell, supra,* 455 A.2d at 411. Where the defense fails to object to the alleged misconduct, we review for plain error and will reverse a conviction only where the "very fairness and integrity of [the] trial" is jeopardized. *Lewis v. United States,* 541 A.2d 145, 146 (D.C.1988); *McCowan v. United States,* 458 A.2d 1191, 1196–97 (D.C.1983) (citing *Watts v. United*

*States,* 362 A.2d 706, 709 (D.C.1976) (en banc)).

■ The prosecutor's conduct in this case must be reviewed under the plain error standard. Coreas failed to object to the prosecutor's rebuttal before the jury retired. Instead, he moved for a mistrial two days after closing arguments—in the middle of jury deliberations and after the jury had announced that it was unable to reach a unanimous verdict. This objection to the prosecutor's rebuttal argument came too late to permit the court to take appropriate and effective corrective action.[9] *Cf. Hawthorne v. United States,* 476 A.2d 164, 169–70 (D.C.1984) (objections made after initial closing argument, despite trial court's admonition to make contemporaneous objections, was sufficient to preserve substantial prejudice review); *Powell, supra,* 455 A.2d at 408 n. 1, 411 (motion for mistrial made immediately after rebuttal preserved substantial prejudice review).

■ In its rebuttal argument, contrary to statements made during its initial closing, the government argued that Coreas was lying in wait for Perez at the bottom of the steps leading from the lobby to the basement:

> [Perez] is crumpled at the bottom of the steps. He has fallen back down at the bottom of the steps. The person who put that bullet in him is the defendant, and had to be behind him when he made that shot....
>
> He couldn't have turned before falling. He must have been going up [sic] the steps, ladies and gentlemen, and that placed the defendant at the bottom of the steps.

8. "Sandbagging" occurs when the government argues a theory of its case that it has not raised in its initial closing. *Moore v. United States,* 120 U.S. App. D.C. 173, 344 F.2d 558, 560 (1965) ("As a general rule, Government counsel should not be allowed to develop new arguments on rebuttal but should be restricted to answering the arguments put forth by defense counsel."). "Improper prosecutorial comments are looked upon with special disfavor when they appear in the rebuttal argument because at that point defense counsel has no opportunity to contest or clarify

what the prosecutor has said." *Hall v. United States,* 540 A.2d 442, 448 (D.C.1988); *see, e.g., Powell v. United States,* 455 A.2d 405, 411 (D.C. 1982).

9. For example, if counsel makes an objection to "sandbagging" at the close of rebuttal argument, one possible corrective, at least in *some* cases may be to permit the defendant an opportunity for rebuttal argument on that point.

We submit that the defendant was standing down here,.... He was down there waiting for Mr. Perez.

Now when Mr. Perez walked down, having put his bucket and pail over to the side, he walked down. He was unsuspecting. He had buddies down there [in the basement] in apartment 14. Anyone of them could have called him or motioned him to come down.

As he walked down the steps the defendant walked out from the darkness and he lifted up his gun and he fired his first shot, the first shot ladies and gentlemen.... So if Mr. Perez was walking down these very steep steps he was significantly above the defendant who was down here.

The defendant was at the bottom of those steps.

(Tr. 698–99, 702).

No direct evidence was presented at trial to support a theory that Coreas waited at the bottom of the steps, or even that Perez was on his way down them. Thus, in its rebuttal argument the government was forced to rely exclusively on the autopsy report and the medical examiner's testimony to establish the order, effect, trajectory and distance of the bullets:

The first shot went into [Perez's] side, at an upward angle, as his leg was outstretched to go down those steps. As the diagram shows, and it was all the way back and lodged in his pelvis.

What was the natural reaction to the first shot?

Mr. Perez started to bend and lean and turn to grab the wound. Before he even lifted his arm the second shot went in as he turned into the side on a straight angle, when the man is still at the bottom of the steps, and firing.

Now, as he leaned in closer to that wound he leaned in closer to the defendant who was down at the bottom. He could have gotten within eighteen inches of that gun, and he could have gotten gunpowder on his sleeve. He continued to grab for his arm and his arm lifted as he reached and turned, and he got that second wound in the side of his arm.

The other one went straight through his body and into the internal cavities.

The gun fire continued, and now he just wanted to get out of there, away from the defendant so that he continued to turn and got the third one in the back of his arm going to the front. That bullet ricocheted off the wall after going through his arm, and landed at the top of the steps.

It was a steep, narrow stairwell. He is turning on his injured wobbling legs, and as he turns his face hits that wall and scrapes on the side. He has scrapes on the left and scrapes on the right.

As he turned, now shot four times and tries to just run out of there, the defendant fires the last one, slightly upward but straight aim with no gunpowder around the wound, more than eighteen inches because it is up another step.

Mr. Perez fell back. The last bullet went over his head, bounded off the wall and landed on the ground. As Mr. Perez fell down the steps and slid the last few steps he bumped the right side of his head on the stairwell causing the abrasions that were not bruisings, just abrasions on the right side of his head....

As the defendant was shooting the— Mr. Perez was leaning forward. That would explain why the wound went straight, but when he stood up there was actually a downward path on the bullet because of the tilt of his body.

(Tr. 699–701).

Although in its brief, the government seeks to characterize its rebuttal as merely, "a more detailed theory of appellant's location and sequence of shots at the time of the killing," its rebuttal depicted much more. In supposed reliance on the only evidence it had—Dr. McMahon's testimony and the autopsy report—the government outlined in vivid detail a scenario that went beyond this evidence and any reasonable inference therefrom. *See Irby v. United States*, 464 A.2d 136, 140 (D.C.1983) (prosecutor "'entitled to make reasonable comments on the evidence and [urge] such inferences from the testimony as will support [the] theory of the case,'") (quoting *Tuck-*

*son v. United States*, 364 A.2d 138, 142 (D.C.1976)). The prosecutor will exceed the line of permissible comment on the evidence by misstating or mischaracterizing the evidence. *See Lewis, supra*, 541 A.2d at 146–47 (plain error for prosecutor to misstate and mischaracterize evidence).

The autopsy report, which contained nothing more than recordations of the internal injuries, along with the point of entry and internal path of the bullets provided the base for the prosecutor's theory. Dr. McMahon, who was not the examining physician, then interpreted this report and testified as to the angle of the bullets *within* the body and the *possible* orders in which the bullets may have entered the body.[10] The prosecutor took this already-

attenuated chain of evidence and extrapolated her lying in wait theory even further by depicting the explicit bodily movements of Perez,[11] the position of the victim and the gun, and the trajectory of the shots.

With respect to the relative positions of Coreas and Perez, Dr. McMahon *explicitly* testified that she could not tell, merely from the autopsy report, *where* Coreas and Perez would have stood in relation to each other at the time the shots were fired.[12] Neither Dr. McMahon nor the autopsy report indicated that the shots were fired from below Perez, or aimed in any particular way. The prosecutor's statement in rebuttal that the "autopsy report ... tells you the angle of every wound and it tells you that the defendant had to be behind

---

10. The prosecutor based her argument as to the order of the bullets on the medical examiner's testimony that it was possible that the shot to the leg came first, followed by the shot to the back, although the medical examiner was hardly consistent on this point.

Dr. McMahon initially testified: "I don't have any doubt that the three to the arm came first. I think those came first. But those last two are the lower body and it is kind of difficult." (Tr. at 334). She also stated that "the one on the pelvis and the one on the back were the last two, I do believe that." (Tr. 333). She then changed her mind and agreed that the one to the leg came first. The court then attempted to summarize the doctor's testimony and stated that "what you are saying is this, is it not, that you are convinced that A, B and C involving the left arm came in a cluster, the first three ... and then either D preceded E or E preceded D," to which the Dr. responded in the affirmative. Later, in reference to questioning by defense counsel, the Dr. agreed that "without witnessing [the shooting]" there "is no way to know with scientific certainty what the sequence was." (Tr. at 336).

11. The prosecutor very deliberately outlined the movements of Perez's body to coincide with its lying in wait theory and the order of the bullets. Thus, in its rebuttal, the government asked rhetorically, "What was the *natural reaction* to the first shot?" She continued that:

"Mr. Perez started to bend and lean and turn to grab the wound.... [n]ow as he leaned in closer to that wound he leaned in closer to the defendant who was down at the bottom ... [h]e continued to grab for his arm and his arm lifted as he reached and turned, and he got the second wound ... and now he just wanted to get out ... so he continued to turn ... then tries to just run out of there."

(Tr. 700).

Perhaps it was necessary to focus on what the prosecutor perceived as *the natural reaction*, because there was no evidence on this record to support this sequence of bodily movement. The autopsy report said nothing about the effect each bullet would have had on Perez's movements. Although the medical examiner "hypothesized" about the position of the arm when gunshot wound A entered ("[t]he arm had to be raised for [the bullet] to go through the armpit because it doesn't exit and re-enter." (Tr. 272, 292), this testimony hardly supports the "grabbing, leaning, and running" that the prosecutor argued to flesh out the facts of its theory.

12. At trial, a Pinocchio doll was produced so that Dr. McMahon could demonstrate the position of decedent's body. The following colloquy occurred:

DOCTOR: Are you asking me where the muzzle of the gun was?

COUNSEL: Yes.

DOCTOR: Or where the assailant was?

COUNSEL: Yes.

DOCTOR: *Not necessarily [sic] because we aren't necessarily dealing with the body in an upright position. You are holding your stick figure up right. That is not necessarily how the decedent was when the gun was fired. So it is difficult for me to say, to track back and say the gun is here and the assailant is here.*

COUNSEL: But with arms—you were discussing something about his arms and legs being mobile. It is—is it equally difficult or more difficult to judge how a bullet entered an arm or a leg because of their mobility?

DOCTOR: .It's not difficult. You can see where they entered. But you don't necessarily know from the wound on the skin, the external wound, the position of the body. That's why you follow the track of the wound in the body to see where it goes,....

(Tr. at 322–23)

Mr. Perez" is a statement without any evidentiary support in the record whatsoever.

Similarly, the medical examiner clearly stated that she could not determine the trajectory or angle of the bullets:

> I can't say that the gun was aimed. I can say the bullet came straight in. I can't say much about the angle of the gun *because you have to take into consideration the angle of the gun and the angle of the body, and I can't do both for you.*

(Tr. at 329) (emphasis added). The doctor continued soon thereafter:

> I can't say the gun was held straight at the body because if the body were angled and the bullet came straight the bullet would enter at an angle. If the body is at an angle and the gun is at an angle then it might enter straight. *But there are all kinds of positions that the body and the gun in the hands of the assailant could have been.*

(Tr. 329–30) (emphasis added). There simply is no evidence concerning the trajectory of the bullets before they struck Perez or of the relative positions of Coreas and Perez.

The prosecutor also argued facts not in evidence to support its lying in wait theory by arguing that the last shot, which the government argued was the shot to the back, was made at a distance because there was "no gun-powder around the wound." This argument implies that there was distance between Coreas and Perez, a fact that was necessary to support the government's theory that Coreas shot at Perez from the bottom of the stairwell and that the killing did not occur while the two men were involved in a physical confrontation consistent with being near each other.

The medical examiner made no determination concerning the distance between the two men. "Stipling" of the skin, which occurs when a gun has been fired at close range will "be filtered out by clothing." *See infra* note 3. A chemical analysis of the gun powder ring that surrounded the bullet entry holes was necessary to determine the distance from which the bullets were fired, and apparently this test was never performed. Perez's outer shirt was lost sometime after the autopsy and therefore was not produced at the trial. Dr. McMahon never had a chance to examine the shirt. His inner shirt contained no such gunpowder rings. Further, although this court does not presume to draw medical conclusions, a simple review of the autopsy report reveals that the medical examiner who examined Perez stated that "[t]he striped shirt [missing at trial] reveals multiple defects. There are three ¼ inch circular holes ... each surrounded by a gray ring of material deposited on the surface of the cloth."

The government hinged its lying in wait argument on the autopsy report and the testimony of the medical examiner—in so doing it extrapolated too much from too little. Such mischaracterization of evidence has been held to constitute plain error. *Lewis, supra,* 541 A.2d at 147. Further, in arguing about the trajectory of the bullets and the relative positions of and distance between Coreas and Perez, the prosecutor fleshed out its theory with facts not in evidence. *Id.* 541 A.2d at 147; *Jones, supra,* 512 A.2d at 257–58.

Finally, to round out its theory of lying in wait, the prosecutor argued a first degree murder theory that Coreas knew that Perez was arriving home from work and that he was waiting for Perez, and that he knew that Perez was walking down the stairs to visit friends:

> when Mr. Perez walked down, ... [h]e was unsuspecting. He had buddies down there in apartment 14. Anyone of them could have called him or motioned him to come down.
>
> As he walked down the steps the defendant walked out from the darkness and he lifted up his gun and he fired his first shot,....

(Tr. at 69g). No one testified that Perez was on his way to see friends, nor was there testimony suggesting that Coreas would have had any way of knowing that Perez would be returning home from work and was on his way to the basement. The fact that Perez had previously friends in the basement is an insufficient basis for

suggesting that Perez would do so on this particular day or that Coreas would know of Perez's intent to do so. This argument was based on facts not in evidence and was also improper. *Jones, supra,* 512 A.2d at 257.

Coreas also asserts that in addition to the lying in wait theory, the prosecutor engaged in several other acts of misconduct. Specifically, he claims that the prosecutor impermissibly: commented on Coreas' credibility; argued that Coreas "set-up" two of his defense witnesses; commented on Coreas' exercise of his right to confront witnesses; implored the jury to "send a message" with its verdict; and appealed to national bias.

■ First, in reference to Coreas' credibility, the government in its initial closing argument asserted that Coreas' statement to the police was "self serving and untrue." The assertion that the statement was "untrue" was improper; prosecutor's may not assert that a witness has lied. *See, e.g., id.; Miller v. United States,* 444 A.2d 13, 16 (D.C.1982); *(Phillip) Dyson v. United States,* 418 A.2d 127, 130 (D.C.1980).

■ In a further attempt to impugn Coreas' credibility, the government argued in rebuttal that Coreas "set up" two defense witnesses, including a police officer, to testify untruthfully. Specifically, in regard to a Mr. Gomez, who had testified for the defense that he saw a suspicious character lurking in the apartment building with a gun and a knife just prior to the shooting, the prosecutor stated:

> Now he did bring in Mr. Gomez. Mr. Gomez said he saw someone with bad intentions. You are supposed to believe that this was Polo Perez.... *Mr. Gomez is a friend. Mr. Gomez is a set-up. He is here to convince you of something that there is no other evidence of.*

(Tr. at 705). The government also argued that a police officer was set-up by Coreas:

> Officer Ayala, he is no hero. He got taken. He was set-up. He comes in here and tells you that he heard all of these rumors, and where did he get his

information. Right there [pointing at Coreas].

(Tr. at 705).

■ Second, the prosecutor argued that Coreas tailored his testimony to comport with the medical examiner's testimony after hearing her testify. The prosecutor claimed that:

> The defendant, he heard that testimony too. Polo Perez, after that last shot wasn't going anywhere. So now we [meaning Coreas] say, "He got up and we struggled and then I shot him...."

(Tr. at 709).

"Drawing an adverse inference from the defendant's exercise of his constitutional right to confront witnesses is impermissible." *Hart v. United States,* 538 A.2d 1146, 1149 (D.C.1988); *Fornah v. United States,* 460 A.2d 556, 560–61 (D.C.1983); *Dyson, supra,* 418 A.2d at 127. We have repeatedly condemned such tactics and do so again. *Fornah, supra,* 460 A.2d at 561 (citing *Jenkins v. United States,* 374 A.2d 581, 584 (D.C., *cert. denied,* 434 U.S. 894, 98 S.Ct. 274, 54 L.Ed.2d 182 (1977)); *Villacres v. United States,* 357 A.2d 423, 426 n. 4 (D.C.1976); *Hyman v. United States,* 342 A.2d 43, 45 (D.C.1975).

■ Third, the government at the very close of its rebuttal, urged the jury to "send a mesage" with its verdict:

> Look at the evidence and return the only true and just verdict in this case, the verdict that tells this defendant that in this country the jury decides and that the jury will not let him convict Mr. Perez and give him his own sentence, that this defendant stood at the bottom of the steps and made a conscious decision to plug Polo Perez with five shots and he can't do that here.

(Tr. at 711). Argument which encourages the jury to "send a message" has been found improper by this court. In *Powell,* we stated that the comment, "Isn't it time that this jury, acting as the conscience of the community, stood up and sent a message to the defendant," was "irrelevant and inappropriate." *Supra,* 455 A.2d at 410. "The function of the jury is to determine facts based on evidence presented.

The jurors are not empaneled to send messages on behalf of their community." *Id.* (citing *Viereck v. United States*, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943)).

■ Finally, it was impermissible for the prosecutor to argue that "in this country the jury decides." This comment was clearly calculated to arouse the national bias and sympathy of the jury and was improper. *Powell, supra* 455 A.2d at 410; *Reed v. United States*, 403 A.2d 725, 730 (D.C.1979).

## III.

■ In determining whether the totality of the several instances of prosecutorial misconduct is prejudicial enough to warrant reversal we consider:

> the gravity of the misconduct, [the] direct relationship [of the misconduct] to the issue of guilt, the effect of specific corrective instructions by the trial court, and the strength of the government's case.

*Lewis, supra,* 541 A.2d at 148 (citing *Hammill v. United States*, 498 A.2d 551, 554 (D.C.1985)).

First, the misconduct in this case was serious. We note that if this case presented nothing more than questions of jury reinstruction and sandbagging, this would be a closer case. There is, however, more at issue. The lying in wait theory propounded by the government placed Coreas at the bottom of the steps waiting for Perez to return from work. As the "unsuspecting" Perez started down the stairs, Coreas, according to the government, "walked out from the darkness and he lifted up his gun and he fired his first shot." To fill in the picture, the government argued the distance, trajectory and order of the bullets and supplied a motive for why Coreas would be going down stairs after work ("he had buddies down there in apartment fourteen. *Anyone of them could have called him or motioned him to come down* "). Since there were no witnesses to the shooting, however, the government was forced to base this entire scenario purely on the autopsy report and the medical examiner's testimony. Thus, the entire lying

in wait theory, with the *possible* exception of the order of the bullets, for which the medical examiner offered several inconsistent "hypotheses" at trial, was based upon facts not in evidence and a mischaracterization of the evidence. The government also acted improperly in asserting that Coreas had told "untruths"; that he had "set-up" defense witnesses to testify in his favor; that he had changed his testimony after hearing the medical examiner testify; by imploring the jury to send Coreas "a message" with their verdict; and by appealing to the jury's nationalist sympathies. Further, all of the prosecutorial misconduct, except for the assertion that Coreas told "untruths" appeared in the government's rebuttal argument. "Improper prosecutorial comments are looked upon with special disfavor when they appear in the rebuttal because at that point defense counsel has no opportunity to contest or clarify what the prosecutor has said." *Hall v. United States*, 540 A.2d 442, 448 (D.C.1988); *Powell, supra,* 455 A.2d at 411.

Second, there was a significant relationship between the issue of guilt and the prosecutorial misconduct in this case. This was an extremely close case. Coreas asserted that he acted in self-defense. The lying in wait theory cut directly against this defense. The prosecutor's statement that Coreas told "untruths" and "set-up" two of his key witnesses also cut at this defense since Coreas' testimony was central to his claim that he had acted in self-defense.

Third, no curative instructions were given. Thus, when the jury retired to deliberate it acted under the assumption that the lying in wait theory advanced by the government was completely proper.

Finally, the government's case was weak. Without the lying in wait theory, the government was left with little to counter Coreas' self-defense claim except perhaps, for the fact that the knife in Perez's waistband left him uninjured, which may suggest that Coreas planted the knife on Perez in order to bolster his claim of self-defense. Other than this, there was testimony placing a man with a gun and a knife

in the apartment building at around the time of the incident, as well as testimony that Coreas had reason to fear Perez. Additionally, photographs of Coreas' injured arms, which injuries he testified were caused by Perez, were allowed into evidence along with statements to the police that Coreas acted out of fear.

Based on all of the above, we find that the cumulative effect of the prosecutorial misconduct jeopardized the very fairness and integrity of the trial.

*Reversed.*

SCHWELB, Associate Judge, dissenting:

Like my colleagues in the majority, I am very troubled by the prosecutor's introduction for the first time on rebuttal of the theory that Coreas was lying in wait for Perez and that the killing was the final act of a premeditated ambush. Nevertheless, because the manslaughter verdict is inconsistent with the notion that the jurors believed this improperly suggested scenario, and because in my view the remaining prosecutorial improprieties of which Coreas complains, if they constitute misconduct at all, fall short of what is required to establish plain error, I must respectfully dissent.

## I

Contrary to the government's argument, the prosecutor's "lying in wait" theory was first presented in her rebuttal. It went far beyond anything that the prosecutor said in her initial closing. Whether or not the various inferences which the prosecutor drew from the medical testimony were reasonable, it was simply unfair to inject an ambush scenario into the case at a time when the defense would have no opportunity to respond. At the very least, the prosecutor should have requested leave of court in advance, rather than making such an argument in the presence of the jury.

Although Coreas was charged with second degree murder while armed, however, he was convicted only of manslaughter while armed. Malice is an element of second degree murder, District of Columbia Criminal Jury Instruction No. 4.23 (3d ed. 1978), but not of voluntary manslaughter, *id.* No. 4.25. If the jurors had believed that Coreas was lying in wait for Perez in order to kill him, then they would surely have found that he acted with malice. Accordingly, unless we assume that the jurors disregarded their sworn duty to follow the court's instructions, and improperly reached a compromise verdict based on sympathy rather than a fair one based on the evidence, I do not see how Coreas could have been prejudiced by an argument which was demonstrably incompatible with the verdict of the jury.[1]

## II

I am unable to agree with the majority that the remaining words and deeds of the prosecutor, individually or cumulatively, or when considered in conjunction with the "lying in wait" argument, justify reversal for plain error. As my colleagues acknowledge, Coreas must show, in the absence of timely objection, that any prosecutorial misconduct so clearly prejudiced his substantial rights as to jeopardize the fairness and integrity of his trial. *Sherrod v. United States*, 478 A.2d 644, 655 (D.C.1984). The Supreme Court has cautioned that reversal for plain error in cases of alleged prosecutorial misconduct should be confined to "particularly egregious" situations. *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). Where, as here, no objection was made, the question is whether the trial judge committed error by failing to intervene *sua sponte*. *United States v. Jen-*

---

1. It is also worth noting that when defense counsel made her belated motion for a mistrial more than a day after the jury began its deliberations, she based it on a plethora of grounds but never mentioned the "lying in wait" theory. After all of the arguments had been completed, the trial judge twice complimented the attorneys on

their performance. *The trial judge is in a far better position than we are to assess the impact of alleged misconduct in the context of the trial as a whole. See Smith v. United States,* 315 A.2d 163, 167 (D.C.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974).

*kins,* 140 U.S.App.D.C. 392, 397, 436 F.2d 140, 145 (1970).

In determining whether the prosecutor's remarks constituted misconduct, we must bear in mind that closing arguments are seldom carefully constructed *in toto* in advance,[2] that improvisation often brings about imperfect syntax and planning, and that courts should not lightly infer that a prosecutor intends a remark to have the most damaging conceivable meaning or that the jury will so understand it. *Donnelly v. DeChristoforo,* 416 U.S. 637, 646–47, 94 S.Ct. 1868, 1872–73, 40 L.Ed.2d 431 (1974); *see also Dixon v. United States,* 565 A.2d 72, 79 (D.C.1989). Moreover, a criminal trial should not be converted into a "quest for error," nor may convictions be lightly overturned on the basis of a prosecutor's comments, standing alone. *Young, supra,* 470 U.S. at 11, 16, 105 S.Ct. at 1044, 1046 (citations omitted). Context is all-important, *id.* at 11, and the assessment of events by the trial judge, as the person on the scene, must be given due weight. *Sherrod, supra,* 478 A.2d at 658 n. 17.

With these principles in mind, I briefly address the alleged prosecutorial misconduct, other than "lying in wait," of which Coreas complains.

### A. Commenting on Coreas' veracity.

During the course of her argument, the prosecutor stated that a part of Coreas' statement to the police was self-serving and untrue. In concluding that this constituted misconduct, my colleagues presumably believe that she was venturing a personal opinion of the defendant's veracity, rather than suggesting inferences from the evidence. In my opinion, however, the context in which the prosecutor made these remarks demonstrates the contrary.

After explaining that Coreas was not disputing important parts of the government's case, the prosecutor said:

Now I told you that parts of [his] statement *would not be corroborated* because parts are self-serving and not true. The medical reports, the autopsy reports, tell us that. You have heard the testimony of the doctor. You will have the opportunity to review the entire autopsy report yourself, to look at every detail.

Characterization of defense testimony as incredible is permissible "when it is a logical inference from the evidence, and not merely the prosecutor's personal opinion as to appellant's veracity." *Hammill v. United States,* 498 A.2d 551, 557 (D.C.1983). A comment is within the acceptable range as long as it is in the nature of argument, and not an outright expression of opinion. *Logan v. United States,* 489 A.2d 485, 490–91 (D.C.1985). Since the prosecutor was comparing the defendant's testimony with other evidence in the record, I do not think that her comment was improper. *See generally Irick v. United States,* 565 A.2d 26, 35 (D.C.1989).

### B. The charge of "setting up" defense witnesses.

The prosecutor's comments about defense witnesses Gomez and Ayala, while more troubling, do not strike me as being (or even measurably contributing to) the stuff of which reversals for plain error are made. The prosecutor commented that

Mr. Gomez is a friend. Mr. Gomez is a set-up. He is here to convince you of something that there is no other evidence of.

There can be no quarrel with the first and third sentences of this commentary; they were based on the evidence or lack thereof. In using the word "set-up", however, the prosecutor missed a golden opportunity to remain silent. The entire second sentence would have better been left unsaid. The prosecutor could have made her entire legitimate point—the lack of corroboration—without resorting to pejorative terminology.

The prosecutor also said of Officer Ayala that he was "no hero," that he "got taken," that he was "set-up" and that he received

---

**2.** Rebuttal arguments, in particular, have to be improvised in the light of what defense counsel has said in his or her closing.

his information from Coreas. In context, these remarks were in response to defense counsel's description of the Officer as "a hero" as well as a "good police officer and a nice man." I see nothing wrong with defense counsel's drawing that inference from the circumstances, or with the prosecutor's drawing a different one.[3] Adversaries may properly argue opposing inferences from the same evidence. Once again, however, the word "set-up" inappropriately introduced a characterization that went well beyond the facts.

The use, twice, of the ill-advised word "set-up", however, appears to me to be a weak reed on which to base, in whole or in substantial part, the reversal of a conviction following a long and hard-fought homicide trial. It did not undermine the integrity or fairness of the trial. If counsel had objected even at the conclusion of argument, the judge could have taken corrective action. In *McCowan v. United States*, 458 A.2d 1191, 1196–99 (D.C.1983), reversal for plain error was found inappropriate where the prosecutor's improper statements were far more serious. I would apply *McCowan* here.

### C. Drawing an adverse inference from the exercise of a constitutional right.

The prosecutor argued that Coreas changed his story after having heard the prosecution's medical testimony. She said:

> The defendant, he heard that testimony too, Polo Perez, after that last shot, wasn't going anywhere. So now we [meaning Coreas] say, "He got up and struggled and then I shot him."

This, according to the majority, was an attempt to persuade the jury to draw an adverse inference from the defendant's exercise of his right to confront witnesses.

In *Jenkins v. United States*, 374 A.2d 581 (D.C.), *cert. denied*, 434 U.S. 894, 98 S.Ct. 274, 54 L.Ed.2d 182 (1977), one of the cases on which my colleagues rely,[4] the prosecutor said:

> Defendant was the one and only witness who sat for all the testimony during trial ... He had an advantage over everybody. He already knew what the evidence was, and he knew exactly what he had to explain away and did everything he could to explain it.

*Id.* at 584. The court questioned the propriety of these remarks and directed trial courts not to countenance such conduct in the future. *Id.* Nevertheless, the court affirmed Jenkins' conviction, noting among other things that the trial judge's view was "entitled to some reliance because only he had the opportunity to appraise the effect of the remarks in their setting."

In *Fornah v. United States*, 460 A.2d 556 (D.C.1983), on which my colleagues also rely, the prosecutor had suggested that Fornah's presence during the prosecution testimony enabled him to tailor his own testimony to present the most plausible defense available. There was no objection, but, on appeal, Fornah asserted plain error. This court disagreed. In the words of Judge Kern, writing for a unanimous court:

> [w]e have held that it is impermissible to attempt to cause the jury to draw adverse inferences from appellant's exercise of his constitutional right to confront

---

**3.** I am, however, concerned by what seems to me to be a misleading rendition of the testimony in the government's brief in this court. The government says that Officer Ayala "essentially acknowledged that he could not be certain that he had not been used by appellant as a set up with [his superiors]." The relevant questions and answers were as follows:

> Q You don't know that the defendant [was] using you as a set-up with your supervisors, do you?
> A No, I don't.
> Q And you don't know if he was trying to befriend you and use you later as, "Hey, I got

a cop on my side and this will make me look good later."
> A No, I don't know that either.

Basically, Officer Ayala was saying that "I don't know any such thing." He was not acknowledging what the government says he was acknowledging.

**4.** Two of the cases cited by the majority, *Villacres v. United States*, 357 A.2d 423, 426 n. 4 (D.C.1976), and *Hyman v. United States*, 342 A.2d 43, 45 (D.C.1975), deal with comments on the defendant's demeanor and do not address the issue here under discussion at all.

witnesses against him. *Dyson v. United States*, 418 A.2d 127, 131 (D.C.1980). Perhaps, from certain of the prosecutor's closing remarks in this case, in isolation, that intent could be ascribed to her. The sorts of remarks we have held objectionable, however, have been far more explicit comments. *See, e.g., Jenkins* [*supra* ]. 460 A.2d at 560–61. The court noted that the remarks in question were "buried in a lengthy closing," *id.* at 561, and that the prosecutor's comments were part of an attempt to supply an explanation of the pertinent events which was different from Fornah's exculpatory account. Under these circumstances, and relying on the passage from *Donnelly v. DeChristoforo* discussed *supra* at p. 607, the court concluded that the prosecutor's remarks "simply do not rise to the level of 'plain error' affecting substantial rights." *Id.*

In my opinion, this case is much like *Fornah*. The prosecutor's allusion to Coreas' exercise of his rights, if that is what the remark was, consisted of the words "he heard that testimony too." As in *Fornah*, the remark was "buried" in a long argument. It was a far more restrained and isolated comment than the remarks in *Jenkins* which this court found to be improper.

Moreover, the prosecutor's alleged impropriety occurred in the midst of a discussion of what she described as a major change in the defendant's story. I think it permissible for counsel, in discussing the defendant's veracity, to highlight any contrast between the defendant's account before he has been apprised of the government's evidence and his version thereafter. Here, the allusion to Coreas' presence in court was incidental to the prosecutor's main theme of exposing the alleged inconsistency between his two accounts. She simply explained the circumstances under which, in the government's view, the defendant's story had changed.

In my opinion, the prosecutor's remarks, in this particular context, were not improper. They would not have been understood by a reasonable juror as an attempt to penalize or discredit Coreas for exercising his right to confront the witnesses against him. Even if her comments were inappropriate, I do not think they would provide any significant support for reversal of this conviction for plain error.

### D. *Patriotism gone awry.*

My colleagues fault the prosecutor for urging the jury to "tell" [5] Coreas that "in this country the jury decides guilt or innocence," and that "here," a victim or relative of a victim may not take the law into his own hands and seek retribution. They say that this comment "was clearly calculated to arouse the national bias and sympathy of the jury and was improper."

Both Coreas and the decedent, Perez, came to this country from El Salvador. If, contrary to *Donnelly v. DeChristoforo, supra,* the prosecutor's comment was to be construed as implicitly chauvinistic and prejudiced against foreigners or persons of Hispanic origin, any belittling of the defendant in this manner would apply equally to the decedent. I think it most unlikely that the prosecutor intended by her remarks to convey disrespect towards people from El Salvador. In a homicide case, it would surely be self-defeating to suggest to the jury that the victim was a person of little worth.

I think the prosecutor's remark about this country is more readily explained, as are many things, by the context in which it was made. Counsel for Coreas described his client as "a husband and a father and a carpenter" who "came to the United States because of the freedoms that we have in the United States, because of the United States Constitution which guarantees these freedoms." She also depicted him as a law-abiding man who went to the police when his brother was killed.

---

**5.** I agree that a prosecutor should not ask the jury to send anyone a message, but this particular message in the context discussed below, was, if anything, a "distasteful cliche-type argument" or a "boring irrelevancy." *(Duane) Dyson v.*

*United States,* 450 A.2d 432, 438 (D.C.1982), *quoting from Harris v. United States,* 131 U.S. App.D.C. 105, 108, 402 F.2d 656, 659 (1968) (Burger, J.).

I do not suggest that what the defense attorney said was improper. I agree with the government, however, that the challenged part of the prosecutor's rebuttal was a fair response to defense counsel's emotional appeal to the jury to find that appellant was merely a law-abiding lover of freedom, who now found himself defending against an unjust charge that he had murdered Apoliano Perez.

### III

In sum, this appeal is based on one serious impropriety which, in my view, did not significantly prejudice Coreas, and several less serious alleged transgressions which, to the extent that they were improper at all, had relatively little potential for prejudice. This, to me, is insufficient to reverse Coreas' conviction, especially for plain error.[6]

I repeat, however, that the presentation of the "lying in wait" theory to the jury, at a time when the defense would have no opportunity to respond, was most unfortunate. When the government seeks to take unfair advantage, our freedoms are less secure. In conclusion, I suggest that the following words by a distinguished Australian prosecutor merit consideration by his counterparts everywhere:

> A prosecutor performs a function which calls for detachment approaching that of a judge.... [T]here is much to know, and much scope for skill and judgment. But in all his doings, his rule of conduct should be that as one of the Queen's men[7] it behooves him—
>
> > [n]either to indict, nor on trial to speak for conviction except upon credible evidence of guilt; nor to do even a little wrong for the sake of expediency, or to pique any person or please any power; not to be either gullible or suspicious, intolerant or over-pliant: in the firm and abiding mind to do right to all manner of people, to seek justice with care, understanding and good countenance.

This is a high note to sound, and often hard to hear in the noise of battle. Fear, the lure of fame, or his own conceit, may lead a man away from this high ideal. But if he could always follow it, a dull fellow whose light was dim in the hurly-burly might prove of more worth than a brilliant brother touched with the vices of his profession.

F. GAFFY, THE ROLE OF THE PROSECUTION IN THE AUTRALIAN LEGAL SYSTEM 20 (World Peace Through Law Center 1981).

---

**6.** I agree with the government both that the evidence was sufficient to support the verdict, and that the conviction should not be reversed because self-defense was omitted from the supplemental instruction which the judge gave in response to a note from the jury. *Davis v. United States,* 510 A.2d 1051, 1052–53 (D.C.1986) (*per curiam*). I agree with the majority, however, that a more balanced response to such a request is preferable.

**7.** It is unfortunate that in voicing these noble sentiments, the author apparently presumed that all prosecutors are men. Fortunately, this is completely untrue in the context of Washington, D.C. *See also Winchester Van Buren Tenants Ass'n v. District of Columbia Rental Housing Comm.,* 550 A.2d 51, 55 n. 10 (D.C.1988), noting similar unenlightened phraseology on the part of Justice Cardozo.