Aaron BATES, Appellant,

v.

UNITED STATES, Appellee.

No. 97–CF–1896, 01–CO–1373, 02–CO–839.

District of Columbia Court of Appeals.

Argued April 22, 2003.

Decided Oct. 23, 2003.

12. We do not consider appellees' alternative argument seeking summary judgment, which the trial court did not reach.

Charles A. Murray for appellant.

Susan A. Nellor, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese, III and Kenneth Kohl, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, SCHWELB and RUIZ, Associate Judges.

RUIZ, Associate Judge:

Following a jury trial, appellant was found guilty of first-degree murder while armed (premeditated)[1] and related weapons offenses. On appeal, he contends that the jury was misled when, in response to a jury note, the trial court reinstructed the jury on the element of premeditation, but without mentioning the element of deliberation. Appellant also asserts that the trial court abused its discretion when, after a post-trial hearing, the trial judge found that a juror was not biased against a defense witness and dispensed with appellant's request to *voir dire* other jurors. We disagree with the contention that the trial court plainly erred when it instructed the jury solely on the element of premeditation. We agree, however, that given the limited record before it, the trial court could not meaningfully exercise discretion committed to it in considering the motion for a new trial without further inquiry into the claim of juror bias. Accordingly, we vacate the order denying the motion for a new trial and remand the case for further proceedings on that issue.

## I.

### FACTUAL BACKGROUND

In the early morning hours of August 30, 1996, Gregory Miller was shot multiple times outside Dino's Metro Club in Northeast, Washington, D.C. He subsequently died from those gunshot wounds.

### A. The Government's Case

At trial, the government's evidence showed that Miller, accompanied by three friends, arrived at Dino's Metro Club at approximately 11:00 p.m., on August 29, 1996. A security guard testified that patrons of the club were unarmed as they had to clear a security check at the entrance. Antoine Wright, a friend of Miller who was with him that night, testified that at approximately 2:00 a.m., about 30 minutes before he was fatally shot, Miller exchanged words with appellant, whom he believed was repeatedly "elbowing him."[2] As a result, security personnel asked appellant to leave the club. Some time later, outside the club, Miller saw the appellant and asked him why he had "elbowed" him. Appellant responded that he was not "beefing" with Miller, pulled his car keys out of his pocket, and, as Miller continued to ask for an explanation, walked backwards in the direction where his car was parked. Miller followed appellant. Ac-

---

1. *See* D.C.Code § 22–2401 and –3201 (1996) (recodified at D.C.Code § 22–2101 and –4502 (2001)).

2. As Wright explained, "[e]lbowing, it means swinging."

cording to eyewitnesses, when appellant reached the passenger side of his car, he unlocked the door and removed a gun from the glove compartment. He then stooped over, as if he was putting a clip in the gun, and made a slapping motion, as if to ensure the clip was secure. Miller turned and began to run down Bladensburg Road when he saw appellant raise his gun. Appellant got out of the car and began to chase Miller and fired two to three shots at him. Miller continued to run from appellant, ducking behind cars as appellant continued the chase, shooting at him. At one point, Miller jumped out from behind a parked car and ran onto Bladensburg Road, where he collapsed face-up on the street. Appellant ran to Miller, stood directly over his prone body, and with his gun a distance of less than two feet from Miller's body, fired nine to ten bullets into Miller's face and chest, emptying his gun. A police officer [3] on duty outside the club also witnessed appellant point his gun in Miller's direction and fire approximately ten or eleven shots. When his gun stopped firing, appellant turned and ran, with the gun still in his hand. Police officers pursued appellant and apprehended him.

### B. The Defense

Appellant testified that he was acting in self-defense. He claimed that shortly after he arrived at the club, the band announced that "CT is in the house," meaning that someone from the Condon Terrace crew was in the club. As appellant was listening to the band, Miller, who was standing in front of him, stepped backwards. Appellant put his hand out to stop Miller, but Miller turned and slapped appellant's hand away. When appellant apologized, Miller replied, "I'm going to start killing these mother fuckers, you know." Appellant was "scared to death" because he knew that Miller was a member of the Condon Terrace crew, which had a reputation for violence.

Once outside the club, appellant testified, he heard Miller behind him saying, "there go that mother fucker right there," "I'm going to bust his ass." Appellant turned to Miller and said, "look man, I said my fault," and walked toward his car. As appellant neared his car, he saw Miller run across the street toward another car. Thinking that Miller was going to get a gun, appellant decided to leave, but realized that his car was blocked.[4] Remembering that he had a loaded 9 mm gun in his glove compartment, he removed the gun, got out of the car and began to run down Bladensburg Road. When he saw Miller run into the street, pull a gun from the waistband of his pants, and point the gun at him, appellant believed that Miller was going to kill him, and fired at Miller. After the first shot, appellant "totally, like, blanked out for a while." He did not recall shooting Miller in the back or shooting him numerous times in the front when he was lying on the ground. When his gun stopped firing, appellant ran down Bladensburg Road, unaware the police were chasing him. He believed that the shots being fired at him were coming from members of the Condon Terrace crew, and only realized that it was the police who were chasing him when a police car cut off his flight.

On cross-examination, appellant admitted that he never communicated his fear of

---

3. Five police officers were at the scene of the shooting.

4. This testimony was disputed. There was a photograph of the area at that time indicating the contrary, as well as testimony from a police officer that the car was not blocked at the time of the shooting.

the Condon Terrace crew to the bouncer at the club or any of the police officers who were positioned directly outside the club on their regular "beat," but said it was because members of the Condon Terrace crew were near the officers. Calvin Antoine Wright corroborated that appellant was afraid; he testified that he witnessed the altercation outside the club between Miller and appellant, and that appellant had a "scared" look on his face. Appellant conceded that his account did not explain the location of shell casings that the police found a distance away—about 106 feetfrom where Miller was killed, in the route of the chase, or the bullet wounds in Miller's back.

A defense witness, Marlo Chaney, who had been at Dino's Metro Club the night of the shooting, testified that after the shooting she saw a man run up to Miller's body and take something. She could not identify exactly what was taken, nor could she give a description of the man; she admitted that she never informed the police or the prosecutor that she had seen someone near Miller's body.

## C. Closing Arguments

During closing arguments, the prosecutor argued that there was no evidence that supported appellant's claim of self-defense. Emphasizing that appellant had brought a gun with fourteen rounds of ammunition to a club which appellant frequented regularly and knew would not permit him to enter with weapons, the prosecutor asked the jury to infer that appellant had ill-intent before he arrived at the club. As appellant failed to ask for assistance from any of the police officers or security personnel, and multiple witnesses saw appellant chase Miller and shoot him in the back, and then approach him and shoot him repeatedly as he lay on the ground, the prosecutor contended that appellant had "an appreciable time to reconsider, an appreciable time to reconsider and he took action"—sufficient to form the intent required for first-degree premeditated murder. He stressed it was "106 feet from the first shell casings" to Miller's body. This physical evidence corroborated eyewitness testimony that appellant first fired two shots at Miller and then ran another 106 feet to shoot him again. That distance, the location of shell casings and bullet wounds showed that it was appellant who pursued Miller, and not vice-versa. The prosecutor argued that a reasonable person in this situation would not have felt at risk of immediate life-threatening harm and used deadly force.

The defense stressed in closing that appellant's self-defense claim was consistent with evidence that demonstrated that Miller was the aggressor, and that appellant's actions were reasonable because he believed that Miller had a gun and was going to shoot him. He pointed to the testimony of Chaney, who saw someone pick up an object (presumably, a gun) from Miller's body after the shooting. Defense counsel noted that Wright, a government witness, testified that appellant had a "scared" look on his face and "backed" away from Miller towards his car outside the club. Defense counsel also argued that the location of the bullet casings was not to be relied upon because they had been strewn all throughout the road as numerous people exited the club and scattered all over after the shooting. He concluded that because appellant thought he could not leave because his car was blocked, and felt he could not approach police because members of the Condon Terrace crew were standing nearby, his actions were reasonably taken in self-defense.

## D. The Jury Notes

The day after beginning its deliberations, the jury sent a note that said, "We

need more explanation on the concept of premeditation." The trial judge summoned counsel, read the note, and discussed his proposed answer to the jury's questions. He told both attorneys that he would reread the instruction for first-degree premeditated murder. Defense counsel suggested that the trial judge not reread the entire first-degree murder instruction, but only the part explaining what constitutes premeditation. The trial judge noted, " . . . I don't have any problem with that either. That's real short. You may have it, they may have it back there. But I['ll] also tell them since we're all here if that doesn't answer their question and they have something more specific, we can ponder what to say about it." The trial judge instructed the jury:

This is the first time I've had a chance to speak to you today. I received your note. And I did provide a definition of premeditation in the written instructions, which you have. I will read that again to you. But I know you have this already. And then since we're all here at this point, if simply reading the definition I've provided doesn't get to your concern, then you will have to send me another communication and I'll see if I can do any better in terms of explaining the concept of premeditation in any other way than I've previously set forth.

Let me just redefine it as I set forth in the instructions. Premeditation means forming an intent or a desire to kill, to premeditate is to give thought before acting to taking a human life and then to reach a definite decision to kill.

I don't know if I can be any clearer than that. But if you have some more specific issue with respect to the concept of premeditation, I think what you need to do is tell me what you're concerned about and if I can be any clearer than I've already been, I will. That's about

the best I can do without knowing exactly what your concerns are . . . .

After a few minutes, the jury sent out a second set of notes. The trial judge informed both attorneys:

I've got two different notes. Both from [juror] number 903. The first one says, "The question's whether premeditation can occur almost instantaneously or need time, i.e. a plot to kill. We know that you gave the definition, but could you elaborate more on the time for intent to kill." Obviously, the intent to kill [can] be as quick as a thought itself. There's another note. "What happens if we can't reach a consensus? How long do we continue to deliberate, we can't reach a consensus on murder one or murder two." So these are two different communications. They're dead locked. I am going to tell them just keep deliberating. But I'll hear you with respect to how I should handle the first note, if you disagree with what I said, either one of you.

The trial judge indicated that he would instruct that premeditation is "the formation of a design to kill, [may be] instantaneous [ ] as quick as thought itself." Defense counsel inquired whether this formulation was "straight out of the instruction," and after the trial judge confirmed it was, counsel commented that it seemed "reasonable given it is in the instructions." With respect to the second question, the judge said he would instruct the jury to continue with deliberations. Neither attorney objected to either instruction. The judge brought the jury into the courtroom and said:

Ladies and gentlemen, I received these two communications. The first dealt with the concept of premeditation. You asked whether or not premeditation can occur almost instantaneously or needs a time or plot to kill. As I said in the

instructions, ladies and gentlemen, premeditation is the formation of a design to kill. It can be instantaneous. As quick as thought itself. So the answer is no, you do not need a plot to kill as set forth in this instruction.

The jury retired, and returned a guilty verdict.

### E. The Motion for New Trial

After the verdict, but before sentencing, appellant filed a motion for a new trial asserting that two jurors who served on his jury failed to disclose to the court their prior relationship with Marlo Chaney, the defense witness who had been at Dino's Metro Club the night of the shooting and who testified at trial that, after the shooting, she saw a man run up to Miller's body and take something. In an affidavit filed in support of appellant's motion for new trial, Chaney stated that when she testified at trial, she recognized one of the jurors, Tom Godwin, as someone she knew because "Tom was someone who was a friend of my mother's." She also stated that he had appeared at "her mother's funeral service and had advised her that the jury found Aaron Bates guilty." According to Chaney's affidavit, "When I asked him if he told the judge that he knew me, he responded that he had not done so." Appellant contended that the affidavit suggested juror partiality, and requested a hearing, which the trial judge granted.[5]

At the hearing, Godwin testified that he knew Chaney and that he had mentioned to other jurors that "he knew her, her mother had just died, and that was why Chaney was grouchy." Godwin testified that although he knew Chaney held him responsible for an incident that resulted in injuries to her son, who fell off a bed while playing when Godwin and his girlfriend were taking care of the child, he did not feel any hostility toward her. In addition, he had recently attended her mother's funeral and there was no friction between them at the funeral. Godwin said that his relationship with Chaney did not affect his consideration of her trial testimony, that he deliberated based on the evidence presented at trial, and that he delivered a fair verdict. In response to defense counsel's question, Godwin stated that Chaney had never "trashed his car." Even though appellant had intended to present Chaney's testimony at the hearing, she was not present. Expanding upon the affidavit, defense counsel proffered that Chaney would testify that either Godwin or his girlfriend had "abused" her child and that she did not remain on good terms with him. Counsel also proffered that Chaney would testify that she had "trashed" Godwin's car in retaliation, and specifically, that she had "literally smashed windows out and sliced tires." The government accepted the defense proffer. Accepting the defense proffer as "true" and crediting Godwin's testimony that he did not harbor any ill will against Chaney, the trial court denied the motion for a new trial on the ground that appellant had not shown that Godwin was biased. Although defense counsel asked to *voir dire* the other jurors, no other juror was heard from.

### II.

### JURY INSTRUCTIONS

 Although appellant was given an opportunity to raise objections to the trial court's reinstruction after the second jury note, he failed to do so. Appellant, therefore, may only prevail on his claim by demonstrating plain error "so clearly prejudicial to substantial rights as to jeopard-

---

5. The other juror was someone with whom Chaney had gone to school. Appellant does not challenge the trial court's action with respect to that juror.

ize the very fairness and integrity of the trial." *Allen v. United States,* 495 A.2d 1145, 1151 (D.C.1985) (en banc) (citation omitted); *see also York v. United States,* 803 A.2d 1009, 1011 (D.C.2002) ("The failure to bring an alleged error to the attention of the trial court, however, though not an abandonment or relinquishment that precludes judicial review, does place a burden on the moving party to show that an error—even one involving a question of law—was plain, affected substantial rights and resulted in manifest injustice."); D.C.Super. Ct.Crim. R. 30 ("No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds for the objection."). The appellant bears the burden of first establishing error, a deviation from the legal rule, and second, demonstrating that the error was "plain [which] is synonymous with 'clear' or, equivalently, 'obvious.'" *United States v. Olano,* 507 U.S. 725, 732–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). In addition, plain error requires a greater showing of harm than that required to obtain relief under the harmless error standard. *See Fields v. United States,* 396 A.2d 522, 525 (D.C.1978). Plain error is found only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done. *See Olano,* 507 U.S. at 736, 113 S.Ct. 1770.

Decisions regarding "whether and how to re-instruct the jury are committed to the broad discretion of the trial court." *Coreas v. United States,* 565 A.2d 594, 599 (D.C.1989). During re-instruction the trial judge should strive to achieve "the ideal of a neutral, balanced instruc-

tion." *Id.* (citation omitted). In reviewing jury instructions, we look at the instructions "as a whole in assessing whether they constituted prejudicial error." *Hunt v. United States,* 729 A.2d 322, 325 (D.C. 1999) (citation omitted).

Although we have not found plain error when some instructions have been omitted, *see, e.g., Jones v. United States,* 477 A.2d 231, 242–43 (D.C.1984) (trial court's failure to *sua sponte* give a cautionary instruction on evidence of other crimes—prior gun possession and threats—was not plain error because the relevance of the evidence was noted by counsel in their closing arguments, its relationship to issues before the jury was not complex or confused, and defense counsel's decision not to request a cautionary instruction was consistent with his trial strategy), "certain instructional errors, which touch upon fundamental constitutional principles or call into question the integrity of the verdict, *will* constitute plain error." *Allen,* 495 A.2d at 1152–53 (equating plain error review with scope of appellate review when defendant fails to comply with Rule 30 requirements). For example, there is plain error where the jury instructions could have confused the jury on the need for a unanimous verdict, *see Davis v. United States,* 448 A.2d 242, 244 (D.C.1982) (per curiam) (ambiguous instruction created the possibility of a verdict that was not unanimous because, combined with the government's alternative theories of the case, some jurors could have found guilt based on the defendant's possession of the first packet of marijuana (but not the second), whereas others could have found guilt based on the possession of the second packet (but not the first)), or the government's burden to prove guilt beyond a reasonable doubt, *see United States v. Alston,* 179 U.S.App. D.C. 129, 130, 132–33, 551 F.2d 315, 316, 318–21

(1976) (ambiguous instruction on guilt beyond a reasonable doubt and government's burden).

As concerns elements of the offense, we have held that an omission of an element will not be plain error where "the relevant facts are so clearly related that no rational jury, shown by its verdict to have found the facts necessary to convict the defendant under the instruction as given, could have failed, if fully instructed on each element, to have found in addition the facts necessary to comprise the omitted element." *White v. United States,* 613 A.2d 869, 870 (D.C.1992) (en banc) (no rational juror finding that writings in question—checks—were false could not have found that checks were of value over $250 where checks were introduced into evidence and not contested).

In this case, appellant contends that by focusing solely on the element of premeditation, the trial court's reinstruction was an incomplete response that confused the jury because the second jury note, which asked about time, implicated the element of deliberation. Specifically, the appellant argues that the reinstruction did not make clear that in order to find appellant guilty of first-degree murder the jury—which had indicated it was already deadlocked—had to find both premeditation and deliberation.

 First-degree murder is the killing of a human being with "deliberate and premeditated malice." D.C.Code § 22–2101 (2001). The primary distinction between first and second-degree murder is that:

[First] degree murder, with its requirement of premeditation and deliberation, covers calculated and planned killings, while homicides that are unplanned or impulsive, even though they are intentional and with malice aforethought, are murder in the second-degree.

*Harris v. United States,* 375 A.2d 505, 507 (D.C.1977)(citing *Austin v. United States,* 127 U.S.App. D.C. 180, 188, 382 F.2d 129, 137 (1967)). "Premeditation" means that the defendant formed the specific intent to kill the victim "for some length of time, however short," before the murderous act. *Austin,* 127 U.S.App. D.C. at 188, 382 F.2d at 137. The separate element of "deliberation" also does not require a minimum lapse of time, "but the reflection and turning over in the mind of the accused concerning his existing design and purpose to kill." *Harris,* 375 A.2d at 505 (citation omitted).

In this case, before the jury retired to deliberate, the trial judge instructed the jury 6:

... The defendant is charged with first-degree murder. I'm going to instruct you on this charge and also on the lesser included offense of second-degree murder.

... First-degree premeditated murder is the killing of another person with the specific intent to kill that person, with premeditation and deliberation, and without self defense or mitigating circumstances.

The essential elements of [this offense], each of which the Government must prove beyond a reasonable doubt, are: One, that the defendant caused the death of the decedent, Gregory Miller. Two, that he did so with the specific intent to kill the decedent, Gregory Miller. Three, that he did so after premeditation. Four, that he did so after deliberation. Five, that he did not act in self defense. Six, that there were no mitigating circumstances. And seven, that the defendant was armed with a pistol.

Specific intent to kill means purpose or conscious intention to cause death. Premeditation means forming an intent or

design to kill. To premeditate is to give thought, before acting to taking a human life and then to reach a definite decision to kill. *Deliberation means considering and reflecting on the preconceived design to kill, turning it over in the mind, giving it second thought.*

Although premeditation, the formation of a design to kill, may be instantaneous, as quick as thought itself, *it is necessary that an appreciable time elapse between the formation of the design and the fatal act within which there is, in fact, deliberation.*

The law requires no particular period of time. It necessarily varies according to the circumstances of each case. Consideration of the matter may continue over a prolonged period: Hours, days, or even longer. Then again, it may cover a span of minutes or less.

*After forming an intent to kill, if one does not act instantly, but pauses and actually gives second thought and consideration to the intended act, he has, in fact, deliberated. It is the fact of deliberation that is essential, not the length of time it may have gone on.*

... The essential elements of second-degree murder while armed, each of which the Government must prove beyond a reasonable doubt, are: One, that the defendant caused the death of the decedent, Gregory Miller. Two, that at the time the defendant did so, he had the specific intent to kill or seriously injure the decedent, or acted in conscious disregard of an extreme risk of death or serious bodily injury to the decedent. Three, that the defendant did not act in self defense. Four, that there were no mitigating circumstances. And five, that the defendant was armed with a pistol.

Second-degree murder differs from first-degree premeditated murder in that it does not require premeditation, deliberation or a specific intent to kill.[6] (Emphasis added)

When the trial judge reinstructed the jury—the issue on appeal—he was responding to a question about "premeditation" which focused on the time element and asked whether a "plot" was required. The judge's reinstruction repeated part of the instruction previously given, that premeditation is "the formation of a design to kill, [may be] instantaneous, [ ] as quick as thought itself," and answered the juror's specific question, saying that "a plot" was not necessary in order to find premeditation. Although there is nothing incorrect in what the trial judge said, the issue is whether, in context, the jury could be confused by what was *not* said. We understand appellant's concern to be that, by focusing solely on the element of premeditation and saying that it requires no minimum lapse of time, the reinstruction was not "neutral and balanced," *Coreas,* 565 A.2d at 599, and might have distracted the jury's attention away from the additional and different element of deliberation. Although no minimum time is required to establish deliberation, *some* time is required after premeditation to give the existing specific intent to kill "reflection and turning over in the mind," *Harris,* 375 A.2d at 508, or, in the words of the instruction, "second thought and consideration." The trial judge might have had this shortcoming of a partial reinstruction in mind when he commented that the instruction on premeditation was "real short" and relied on the fact that the jury had the "entire" jury instruction with them. The full instruction made clear that in contrast with premeditation which "may be instantaneous—as quick as thought itself, *it is necessary that an appreciable time elapse between formulation of the design and the*

**6.** The jury was given a written copy of the *judge's instructions.*

factual act, within which there is, in fact, deliberation." (Emphasis added.) [7] Although we have no doubt it would have been better to remind the jury of the element of deliberation in the reinstruction, we conclude that in light of the specific question asked, and given the trial judge's reliance that the jury had been given and had access to the full instruction, the partial reinstruction was not obviously wrong.

We also think from the evidence of record, that there was no miscarriage of justice because no reasonable juror would find that the appellant did not deliberate before he killed Miller. Appellant's self-defense theory is that he took his gun, ran and shot at Miller because he was "scared" of Miller and thought Miller was going to kill him. Even if the jury believed that appellant was scared in the club and when he got his gun from the car and began to run, it could not reasonably have found that he did not form the specific intent to kill or that he did not have time to deliberate. There is ample evidence that after Miller, who had been wounded in the back during the chase, fell to the ground, appellant ran another 106 feet to where he had fallen on the ground before the final shots were fired. This gave appellant sufficient time to form "the intent to kill," *i.e.*, premeditate, *and* to deliberate on that intent as he approached Miller, stood over his body and fired ten rounds of bullets into

his face and chest at close range. There also was overwhelming evidence from eyewitnesses that appellant chased an unarmed Miller, repeatedly shooting at him until he fell to the ground, and then proceeded to unload his weapon into his body. Wright testified that after Miller fell, he was still "trying to get away" from appellant. This may not be evidence of the "plot" the juror's question had in mind, but it was evidence of a calculated killing. Deliberation's "turning over" in the mind only requires a showing that a person considered his decision to kill. The lapse of time between the shots to Miller's back and appellant's approach to where he fell on the ground, combined with the manner in which appellant fired the final round, make it highly improbable that a reasonable juror would find that appellant formed an intent to kill, but doubt that he deliberated on his decision to do so. Even though the evidence in this case is not as conclusive as was the case in *White*, 613 A.2d. at 879, neither is this a case where there was a complete failure to instruct on an element of the offense. As noted, the jury was first fully instructed on deliberation and it was only in response to a question that a partial reinstruction was given.[8]

### III.

### JUROR BIAS

"The determination of juror bias or prejudice lies particularly within

---

7. In closing argument, the prosecutor commented that the 106 feet appellant ran to reach Miller where he had fallen on the ground had provided that "appreciable time"—reminding the jurors of the element of deliberation.

8. We detect here no change of government theory midtrial or other indication of possible jury confusion, as existed in *Hawkins v. United States*, 434 A.2d 446, 449 (D.C.1981), where we held that the court erred in reinstructing the jury, after deliberations had begun, that it could find either a simple assault,

as charged, or a series of assaults, but that it did not have to "break down the incidents." In *Hawkins*, the deliberating jury sent a note to the trial judge showing it was confused about the issue, whereupon the judge gave the jury additional, but ambiguous, instructions which altered the legal theory of the case. In addition, in *Hawkins* the judge gave an affirmative instruction that the jury in fact did not "have to break down the incidents," *id.* at 449, "which has been held reversible error under the federal practice." *Shivers v. United States*, 533 A.2d 258, 263 (D.C.1987).

the discretion of the trial court, reversible only for a clear abuse of discretion ... and the findings of fact underlying that determination are entitled to 'great deference."' *Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 185 (D.C.1990) (citation omitted). A trial judge has considerable discretion in conducting an investigation into alleged juror misconduct. *See Leeper v. United States*, 579 A.2d 695 at 699 ("the extent and type of the trial court's investigation into the improper contact are confided to the court's discretion and reviewable only for abuse") (citations omitted). Appellant contends that the trial court abused its discretion in denying his motion for a new trial without conducting a *voir dire* of all the jurors to investigate his claim of juror bias. We do not decide that question because we conclude that within the framework chosen by the trial judge, it was an abuse of discretion to deny the motion for a new trial without further inquiry into the possibility of juror bias.

Godwin testified that he mentioned to other jurors that he knew Chaney and her deceased mother and that Chaney held him responsible for an incident that resulted in relatively minor injuries to her son. He denied feeling any hostility toward Chaney, and also denied that she had vandalized his car. The trial judge explicitly credited Godwin's testimony that "any relationship that [Godwin] had with Ms. Chaney did not impact upon his fairness and impartiality in this case," and found that appellant failed to demonstrate that anything said or done by Godwin, or that Godwin's past relationship with members of the Chaney family, "had any impact at all on his deliberations in this case or the verdict." Relying upon Godwin's testimony and his assertion that he was not biased against Chaney, the trial judge denied appellant's motion for a new trial, without questioning any of the other jurors.

We cannot square the judge's conclusion with his acceptance "as true" of defense counsel's proffer that Chaney would testify that Godwin or his girlfriend had "abused" Chaney's child, and that Chaney had retaliated by destroying the tires and windows of Godwin's car. Also accepted as true was the proffer that Chaney's testimony would challenge Godwin's claim that he remained on good terms with Chaney after her son was injured. It is illogical to credit both a witness's in-court testimony and the proffer that another witness would present contrary testimony on a material fact. If the proffer is credited, Godwin was biased against Chaney, and he could have conveyed his hostility against her to the other jurors. That could have led to their disbelieving Chaney's testimony suggesting that Miller had a gun. Chaney's testimony was the only evidence presented that corroborated appellant's claim that he acted in self-defense because he was afraid that Miller had a gun and was going to shoot him. Thus, Chaney's testimony, if believed, was vital to appellant's claim that he acted in self-defense.

Given the direct conflict between Godwin's testimony and defense counsel's proffer of Chaney's testimony, the trial court could not credit Godwin's testimony that he was not biased against Chaney without first evaluating her credibility. If, after hearing from Chaney, there was a possibility of bias, the trial judge should have questioned the other members of the jury in order to determine what Godwin told them about Chaney, and how it might have affected their perception of her trial testimony. Without hearing from Chaney and in the absence of *voir dire*, the trial judge lacked a factual foundation to determine whether there was jury bias requiring a new trial. Accordingly, on the present record, the court's determination that appellant suffered no actual prejudice as a result of the prior contact between a wit-

ness and a juror cannot stand. We vacate the order denying the motion for a new trial and remand for further proceedings.[9]

*So ordered.*[10]

9. At oral argument, counsel for appellant represented that in a second affidavit Chaney had denied that she "trashed" Godwin's car. In that affidavit Chaney also declared that she had informed defense counsel during trial that she recognized Godwin. Appellant moved to supplement the trial record to include Chaney's second affidavit as part of his claim of ineffective assistance of counsel to show that counsel did not raise the issue of juror bias until after the verdict. The trial court denied this request, and appellant challenges the trial court's ruling excluding the affidavit in No. 02–CO–839. On remand, the trial court may reconsider its ruling on the new trial motion in light of that affidavit, and we express no opinion at this time on the trial court's denial of the appellant's motion to supplement, or on the apparent conflict between Chaney's two affidavits on whether she "trashed" Godwin's car. We note that the trial record is sparse on the facts underlying Chaney's accusation that Godwin abused her young child. The trial court also should consider on remand whether, even if Godwin did not himself harbor ill will toward Chaney, other jurors could have thought her trial testimony unworthy of belief if they felt she had falsely accused him of child abuse.

10. We have considered and see no merit in appellant's other claims that the trial court abused its discretion by limiting testimony regarding the Condon Terrace Crew, denying appellant's motion to suppress evidence recovered in a warrantless search, and in admitting photographs of the decedent to show premeditation and deliberation. Other than, possibly, in connection with the question of juror bias that is the subject of the remand, we see no merit to appellant's ineffective assistance of counsel claim.