*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 24-CO-0255

BERNARD BRYANT, JR., APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(1999-FEL-008280)

(Hon. Elizabeth Carroll Wingo, Motions Judge)

(Submitted February 26, 2025            Decided August 21, 2025)

*Sean R. Day* was on the brief for appellant.

*Kevin Birney*, Assistant United States Attorney, with whom *Matthew M. Graves,* United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, and *Kristina L. Ament*, Assistant United States Attorneys, were on the brief for appellee.

Before DEAHL and HOWARD, *Associate Judges*, and GLICKMAN, *Senior Judge*.

DEAHL, *Associate Judge*: When Bernard Bryant, Jr. was twenty years old, he committed second-degree murder. He received a sentence of twenty years to life for that offense and two attendant offenses related to his possession of a firearm. After twenty-four years of incarceration, Bryant moved for a sentence reduction under the

Incarceration Reduction Amendment Act. The trial court denied Bryant's request for resentencing after concluding that he had not established either condition for IRAA relief. That is, the trial court concluded that Bryant had not established his non-dangerousness nor had he established that the interests of justice favored a reduction in his sentence.

We vacate the trial court's order and remand the case for reconsideration. The trial court committed three missteps in weighing IRAA's factors that, in combination, convince us that it should reconsider its ruling with those errors corrected.

First, the trial court found that IRAA factor nine, which asks in part "whether and to what extent another person was involved in the offense," did not weigh in favor of IRAA relief. It reasoned that Bryant "was the sole individual involved in the offense" and "no one else was involved in the decision to pull out a gun and shoot into a crowd." In our view, that misstates the record and ignores the strong mitigating evidence that Bryant fired into the group of individuals only after they began viciously attacking his friend to the point of rendering him unconscious. When IRAA directs trial courts to account for the extent to which other individuals are involved in the offense, that includes accounting for the role of third-party attackers, provocateurs, and instigators. By ignoring the considerable third-party

provocations that prompted this offense, the trial court erred. *Bishop v. United States*, 310 A.3d 629, 641 (D.C. 2024) (trial court abuses its discretion under IRAA when it "fail[s] to consider a relevant factor" (quoting *Crater v. Oliver*, 201 A.3d 582, 584 (D.C. 2019))).

Second, the trial court concluded that IRAA's second factor, concerning Bryant's "history and characteristics," weighed against any relief largely because Bryant had a "generally good" childhood free from "any sexual, verbal, or physical abuse." That also misstates the evidence. The undisputed evidence was that as a fourteen-year-old boy, a nineteen-year-old woman engaged Bryant in a sexual relationship after introducing him to binge drinking alcohol the year before, when he was just thirteen. While jurists could reasonably debate the mitigating force of that sexual abuse, Bryant was inarguably the victim of child sexual abuse, given that he was under the age of sixteen and an adult more than four years older than him was having sex with him. *See* D.C. Code § 22-3001(3) ("'Child' means a person who has not yet attained the age of 16 years."); *id.* at §§ 22-3008, -3009 (defining first- and second-degree child sexual abuse). The trial court overlooked this seemingly important fact when it concluded that Bryant's childhood was free from any sexual abuse. The trial court repeated this error when it again ignored this evidence under factor eight, which it determined did not weigh in Bryant's favor.

*See* D.C. Code § 24-403.03(c)(8) (relating to movant's "history of abuse" and "trauma" among other things).

Third, the trial court gave outsized weight to Bryant's pre-offense criminal history during his teenage years. While there is nothing categorically wrong with the trial court taking one's teenage criminal history into some account, IRAA's fundamental premise is that youthful offenders are not fully developed, are less culpable and more likely to rehabilitate, and thus are deserving of a meaningful opportunity to get out of prison. On balance, we conclude that the trial court gave excessive weight to Bryant's criminal history during his teen years, contrary to IRAA's core animating purpose.

## I. Factual and Procedural Background

In 1999, when he was twenty years old, Bryant visited a Georgetown nightclub with his friend, Paul Simmons. As Bryant and Simmons were leaving the club in the early morning hours, they came upon a man and a woman in a heated argument. Simmons watched the argument and possibly exchanged some words with the man (accounts conflicted about that), but in either case that prompted the man and his friends to quickly turn their hostilities toward Simmons. The man and his friends began viciously beating Simmons, to the point where he lost consciousness and would later have to be taken to the intensive care unit. As the

beating continued, Bryant fired four shots "aimlessly" into the crowd of people fighting. Tyreen Chaney, who was one was one of Simmons's attackers, suffered several gunshot wounds and died a few hours later.

The government indicted Bryant for first-degree murder and related weapons offenses. After the jury was deadlocked at Bryant's first trial, leading the court to declare a mistrial, a jury at Bryant's second trial acquitted him of first-degree murder and convicted him of the lesser-included offense of second-degree murder. The jury also convicted Bryant of possession of a firearm during a crime of violence and carrying a pistol without a license. Bryant was sentenced to an aggregate term of twenty-one years to life in prison, and we affirmed his convictions on direct appeal. *Bryant v. United States*, Mem. Op. & J., No. 02-CF-1241 (D.C. Feb. 15, 2005).

In 2023, Bryant moved for a sentence reduction under IRAA. *See* D.C. Code § 24-403.03. Bryant met the threshold eligibility criteria for IRAA relief because he committed his crime when he was under the age of twenty-five and had served more than fifteen years in prison. *Id.* § 24-403.03(a)(1). IRAA requires a trial court to "reduce a term of imprisonment" for an eligible movant if they are no longer "a danger to the safety of any person or the community" and "the interests of justice warrant a sentence modification." *Id.* § 24-403.03(a)(2). In assessing those questions, the trial judge must consider ten statutory factors, plus an eleventh catch-

all factor accounting for "[a]ny other information the court deems relevant." *Id.* § 24-403.03(c)(1-11);[1] *see Doe v. United States*, 333 A.3d 893, 899 (D.C. 2025) (explaining process of applying IRAA's "merits criteria").

---

[1] The ten factors are:

(1) The defendant's age at the time of the offense;

(2) The history and characteristics of the defendant;

(3) Whether the defendant has substantially complied with the rules of the institution to which the defendant has been confined, and whether the defendant has completed any educational, vocational, or other program, where available;

(4) Any report or recommendation received from the United States Attorney;

(5) Whether the defendant has demonstrated maturity, rehabilitation, and a fitness to reenter society sufficient to justify a sentence reduction;

(6) Any statement, provided orally or in writing, provided pursuant to § 23-1904 or 18 U.S.C. § 3771 by a victim of the offense for which the defendant is imprisoned, or by a family member of the victim if the victim is deceased;

(7) Any reports of physical, mental, or psychiatric examinations of the defendant conducted by licensed health care professionals;

(8) The defendant's family and community circumstances at the time of the offense, including any history of abuse, trauma, or involvement in the child welfare system;

(9) The extent of the defendant's role in the offense and whether and to what extent another person was involved in the offense;

(10) The diminished culpability of juveniles and persons under age 25, as compared to that of older adults, and the hallmark features of youth, including immaturity, impetuosity, and failure to appreciate risks and consequences, which counsel against sentencing them to lengthy terms in prison, despite the brutality or cold-blooded nature of any particular crime, and the defendant's personal circumstances that support an aging out of crime.

In his IRAA motion, Bryant argued that he had "grown from an impulsive and troubled young person into a peaceful, thoughtful adult who is well-adjusted, remorseful, and deserving of a second chance." While Bryant described his childhood as generally "good," he highlighted many serious difficulties. These included a frequently absent father who suffered from alcoholism, which "broke up the family" and led Bryant's mother to move out with Bryant and his siblings. Bryant began binge drinking at age thirteen, with the encouragement of a young woman in the neighborhood named Tracy who was five years older than him, and by the time he was fifteen or sixteen he was drinking heavily, roughly a fifth of alcohol in a day, three to four times a week. As described in the mitigation report attached to Bryant's IRAA motion, a year after Bryant met Tracy—when he was fourteen and she was nineteen—he had "his first sexual experience" with her. Bryant described this experience in his IRAA pleadings as "trauma he suffered at the hands of a neighbor."

Bryant's IRAA motion also focused on his substantial network of family and community support that was ready to assist him with re-entry. This included a reentry "steering committee"—comprised of his wife, mother, best friend, and therapist—which had housing, mental health treatment, transportation, and other resources available for Bryant upon his potential release. Bryant attached twenty-

six letters of support from various family members and friends who pledged to help Bryant find employment and mentorship, among other things.

The government opposed Bryant's motion largely on the basis of Bryant's prison infractions, his criminal history preceding the murder, and his failure to "accept[] responsibility" for killing Chaney. The government highlighted the fact that Bryant had described his crime as an "accident" during a parole hearing. The government also noted that Bryant "described his childhood in pleasant terms" and "[t]here was no report of any sexual, physical, or verbal abuse."

After an evidentiary hearing, the trial court denied Bryant's motion in a written order. We summarize the trial court's analysis with a focus on the IRAA factors that the trial court weighed most heavily.

The trial court determined that factor two, concerning Bryant's "history and characteristics," weighed "heavily" against granting relief. The trial court acknowledged his father's alcoholism and the impact it had on Bryant's "choices regarding drugs and alcohol," but found this was counterbalanced by Bryant's "significant and violent criminal history" leading up to the murder. Beginning in 1993 when Bryant was fourteen, this history entailed arrests—including "arrests terminated without a finding of involvement"—and adjudications for "multiple juvenile offenses," including breaking and entering and failure to control a motor

vehicle. The trial court also cited adult convictions he received for second-degree assault, theft, and robbery, as well as "other adult cases" that were not prosecuted. Bryant's criminal history stood in stark contrast to his generally stable "suburban, middle-class upbringing," in the trial court's view.

The trial court found factor three—relating to whether Bryant "substantially complied" with prison rules and completed helpful programming—to also weigh "heavily" against relief. While commending Bryant for obtaining his GED and participating in drug treatment and other courses, the trial court homed in on "the number and nature of infractions he has incurred." Over twenty-three years of incarceration, Bryant received twenty-six infractions, most of which the trial court acknowledged were "minor," like "[b]eing insolent" to a staff member, "[r]efusing" a work assignment, and "[p]hone abuse." But the trial court flagged three of his infractions, all more than a decade old and occurring between 2009 and 2014, that involved drugs or the possession of a weapon. The trial court was particularly "concern[ed]" by his 2011 infraction for attempting to introduce heroin into prison through a visitor, which the Bureau of Prisons described as a conspiracy led by Bryant. Those three infractions, in the court's view, outweighed Bryant's positive strides toward rehabilitation and the fact that Bryant had no disciplinary infractions since 2021, no serious infractions since 2014, and had never been involved in "any violent or assaultive incidents."

As to factor nine, which relates to "the defendant's role in the offense and whether and to what extent another person was involved in the offense," the court said this factor did "not weigh in favor of" relief. The court's reasoning, in its entirety, was as follows: "The Defendant was the sole individual involved in the offense; no one else was involved in the decision to pull out a gun and shoot into a crowd, killing Mr. Chaney. This factor does not weigh in favor of the grant of Defendant's motion."

We can quickly move through the remaining factors. The court found that factor five—which relates to Bryant's "demonstrated maturity, rehabilitation, and a fitness to reenter society"—was "in equipoise." The trial court praised Bryant's "strong support plan" and "sincere remorse," but the court was troubled by Bryant's recent and repeated use of the word "accident" to describe his crime, as if to downplay his responsibility for the murder. Factor eight—relating to Bryant's "family and community circumstances at the time of the offense, including history of abuse, trauma, or involvement in the child welfare system"—similarly did not weigh in favor of relief because Bryant was "well-provided for" and "not subject to abuse in the home." Factors one and ten—relating to Bryant's age and the inherent "diminished culpability of juveniles," respectively—were the only two factors the trial court weighed in Bryant's favor. The trial court noted under factor four, regarding "[a]ny report or recommendation received from the United States

Attorney," that the government opposed his release. The trial court did not appear to give any weight to factor six, relating to the victim's or victim's family's statements, because no such statements were submitted during the IRAA proceedings. Finally, the trial court did not find "[a]ny other information" to be "relevant" under factor eleven.

In light of those assessments, the court reasoned that Bryant had failed to demonstrate that he was not presently dangerous or that a reduction in sentence would be in the interests of justice. The sticking points for the trial court were Bryant's record of prison infractions, especially his 2011 infraction for attempting to bring heroin into prison, and the "lengthy and serious history of criminal conduct [Bryant] amassed prior to his arrest in this matter despite his relatively young age." Bryant now appeals.

## II. Analysis

"We review the denial of an IRAA motion for abuse of discretion." *Bishop*, 310 A.3d at 641. In conducting that review, we ask whether the court "failed to consider a relevant factor," "relied upon an improper factor," and "whether the reasons given reasonably support the conclusion." *Id.* (quoting *Crater*, 201 A.3d at 584). The trial court's reasons must "rest upon a specific factual predicate" and must be "'reasonable and proper in the specific factual context' of the case." *Henny v.*

*United States*, 321 A.3d 621, 629 (D.C. 2024) (quoting *Johnson v. United States*, 398 A.2d 354, 364 (D.C. 1979)). "[R]eversal likely is called for" when "the trial court's decision is supported by improper reasons, reasons that are not founded in the record, or reasons which contravene the policies meant to guide the trial court's discretion." *Johnson*, 398 A.2d at 367.

Bryant argues on appeal that the trial court erred in several respects by (1) failing to consider how the third parties who instigated the underlying affray mitigated his culpability for his offense; (2) misstating that Bryant had not experienced sexual abuse during his childhood; (3) too heavily weighing his juvenile criminal record in the analysis, including instances where he was merely arrested; (4) too heavily weighing his 2011 infraction for bringing heroin into prison; and (5) pinpointing his use of the word "accident" as weakening his other expressions of remorse and responsibility, given that the word is a colloquially fair descriptor for what occurred. We address these arguments in turn before addressing the government's argument that any errors were harmless.

*A. The trial court erroneously failed to consider, under IRAA factor nine, the mitigating fact that people other than Bryant instigated the affray*

Bryant argues that the trial court erred by "fail[ing] to consider the mitigating circumstances underlying" his crime, namely, that "Bryant was responding to his friend being beaten to the point of landing in the hospital's intensive care unit." We

agree that this was an important fact that the trial court failed to take into account under IRAA factor nine, concerning "[t]he extent of the defendant's role in the offense and whether and to what extent another person was involved in the offense."

In concluding that factor nine did "not weigh in favor" of relief, the court reasoned that Bryant "was the sole individual involved in the offense" and "no one else was involved in the decision to pull out a gun and shoot into a crowd." That characterization of the incident leaves out a materially important feature of it. It is true that Bryant is the only person who decided to pull a gun and shoot into a crowd, and of course—as with any criminal offense—he bears personal responsibility for the individual choices that he made. Still, what factor nine instructs trial courts to do is to assess the extent to which other individuals' actions might to some degree mitigate the defendant's culpability for the underlying offense. So while Bryant made the tragically poor decision to fire a gun several times into a violent mob, it appears he did so in the heat of the moment to protect a friend who was being viciously beaten unconscious by that very mob. These are not exculpatory facts; Bryant raised a seemingly plausible defense-of-others claim that his jury was instructed on and, after a retrial, rejected. But they are certainly mitigating facts that the trial court had to take into account.

Yet the trial court's consideration of this ninth factor made no mention of this strong mitigation evidence. The court never recounted in its analysis, even indirectly, that Bryant was reacting to a situation where a group of people were viciously attacking his friend. Although we do not have access to a second-by-second timeline of the incident, the record demonstrates that Bryant saw Simmons get punched "several times" in the face before shooting, with those punches being powerful enough to cause Simmons to "lose consciousness" and eventually be taken to the ICU. The government has never disputed Bryant's account that Chaney—the victim of Bryant's shooting—was involved in the attack on Simmons, which is consistent with the accounts of Bryant's offense that are available to us. Evidently this mitigating evidence—which would tend to show that Bryant acted reactively instead of with "premeditation and deliberation"—was why Bryant's jury acquitted him of first-degree murder. *Busey v. United States*, 747 A.2d 1153, 1160 (D.C. 2000) (explaining distinction between first- and second-degree murder); *see also Bates v. United States*, 834 A.2d 85, 93 (D.C. 2003) ("[H]omicides that are unplanned or impulsive, even though they are intentional and with malice aforethought, are murder in the second-degree." (quoting *Harris v. United States*, 375 A.2d 505, 507 (D.C. 1977))). Yet the trial court failed to account for these core facts when considering "whether and to what extent another person was involved in the offense," despite their seemingly strong mitigating force.

To be clear, attackers, provocateurs, instigators, and other similar actors can be "involved" in a criminal offense under that word's plain meaning, D.C. Code § 24-403.03(c)(9), even when they are hostile to the defendant rather than working in concert with them. When two people are in a fight, after all, they are both involved in it. And there is no indication from IRAA's legislative history that the D.C. Council intended to limit "involved" persons to accomplices or similar third parties who encouraged the IRAA movant's offense. If anything, evidence pertaining to the role of an instigator or similar figure is typically more powerful mitigation than the presence of an accomplice or some peer pressure; only the former is tethered to "legally recognized mitigating factors" in the traditional criminal law sense, *Comber v. United States*, 584 A.2d 26, 40-41 (D.C. 1990) (en banc), and the Council clearly made room for its consideration under the umbrella of factor nine.

We recently noted in the compassionate release context that "it is critical that [the trial court] demonstrate an accurate understanding of the core facts of the underlying offenses." *Colbert v. United States*, 310 A.3d 608, 615 (D.C. 2024). In *Colbert*, we faulted the trial court for "ignoring . . . mitigating factors" and "describ[ing] the facts of a manslaughter conviction as if it were a first- or second-degree murder conviction." *Id.* at 615-16. Although we ultimately affirmed the denial of compassionate release, we nonetheless flagged for "future proceedings" that the trial court should not downplay the actions of the aggressor in the underlying

case, which involved reinitiating a fight that had cooled down and hitting Colbert on the head with a shovel (after which Colbert stabbed the aggressor). *Id.* at 616. This same principle applies in IRAA cases, where the trial court is similarly tasked—even more directly so—with looking at the role of other people in the underlying offense. *Compare* D.C. Code § 24-403.04 (to grant compassionate release, trial court must consider "nature and circumstances of the offense" under 18 U.S.C. § 3142(g)(1)), *with* D.C. Code § 24-403.03(c)(9) (to grant IRAA relief, trial court must consider movant's "role in the offense and whether and to what extent another person was involved").

In sum, one cannot meaningfully assess Bryant's "role in the offense" and the extent to which "another person was involved" without accounting for how the extreme provocation of Simmons's attackers led to this shooting. The trial court's failure to account for that in its analysis was error.[2] These were important facts to the proper consideration of IRAA's ninth factor.

---

[2] There was one sentence in the trial court's background description of the events which noted that Bryant "and Mr. Simmons saw a group of people standing outside of the nightclub arguing," and that "[o]ne of those people punched Mr. Simmons several times, causing him to lose consciousness." While even that seems to underplay the severity of the beating that Simmons suffered, we do not doubt that the trial court understood the surrounding facts on this point. Its error lies in its failure to attach any importance to these facts when weighing IRAA factor nine.

*B. The trial court's finding that Bryant did not experience
sexual abuse in his youth was clearly erroneous*

Bryant next argues that the trial court incorrectly found that he was not sexually abused in his youth, a point relevant to its consideration of IRAA factor two, regarding Bryant's "history and characteristics," and IRAA factor eight, regarding his "history of abuse" and "trauma."

Bryant is correct that the trial court clearly erred when it found that he had not been sexually abused in his childhood. The mitigation report that Bryant submitted in support of his IRAA motion, authored by mitigation specialist Christine Penry, details the sexually abusive relationship that Bryant's neighbor, Tracy, had with him. This relationship was fueled by alcohol and involved Bryant's "first sexual experience," which occurred when he was fourteen and Tracy was nineteen. Whatever one thinks about the mitigating force of the sexual abuse that Bryant suffered at Tracy's hands, it is indisputable that Bryant was the victim of child sexual abuse in his youth. *See Koonce v. United States*, 993 A.2d 544, 551 (D.C. 2010) (the three elements of first-degree child abuse are (1) the defendant engages in a "sexual act," (2) with a "child," and (3) the defendant is more than four years older than the child); *In re D.W.*, 989 A.2d 196, 207 (D.C. 2010) (explaining that second-degree child sexual abuse involves the same elements but a mere "sexual contact," rather than a sexual act, will suffice); *see also* D.C. Code § 22-3001(3), (8), (9)

(defining "child" as someone under the age of 16, defining "sexual act" fairly broadly, and defining "sexual contact").[3]

The government counters by faulting Bryant for not mentioning this sexual abuse in the body of his IRAA motion, and for not labelling it as "abuse." It is fair enough to assign some blame to Bryant for his failures to highlight this sexual abuse in his initial IRAA motion, but he did highlight the abuse in his reply pleading, where he referenced the "earlier trauma he suffered at the hands of a neighbor." And in any event, whatever Bryant's shortcomings were in failing to put this point front and center in his request for IRAA relief, the relevant facts featured in Penry's mitigation report, and it is hardly a legal obscurity that adults having sex with fourteen-year-olds amounts to child sexual abuse. The trial court's conclusion that Bryant did not experience sexual abuse lacked a "factual predicate" and was thus error. *Henny*, 321 A.3d at 629 (quoting *Johnson*, 398 A.2d at 364).

---

[3] When one describes their "first sexual experience," we would generally understand them to be referring to a "sexual act," which would render Bryant the victim of first-degree child sexual abuse. But Bryant never described this sexual experience in any detail, so we cannot rule out the possibility that it involved a mere "sexual contact," which would instead render Bryant the victim of second-degree child sexual abuse. *Compare* D.C. Code § 22-3001(8) (defining "sexual act"), *with id.* § 22-3001(9) (defining "sexual contact"). The difference is not important to our view that the trial court must account for Bryant's sexual abuse in any event.

*C. The trial court abused its discretion by giving excessive weight to Bryant's arrests and convictions during his teenage years*

Bryant argues that IRAA does not allow convictions from his teenage years to weigh heavily against relief, and he especially faults the trial court for weighing some teenage arrests and charges (both as a juvenile and a fledgling adult) that did not result in any convictions or adjudications against him. In his words, if a "1999 homicide cannot be a bar to release, a 1998 robbery cannot be a bar, either."

We agree with Bryant that the trial court put too much stock in his teenage arrests and convictions. The underlying premise of IRAA is that young people, due to their age, do not have "fully developed" brains and thus "have a more difficult time grasping long-term consequences and are more likely to have impaired judgment." *Bishop*, 310 A.3d at 635 (quoting Comm. on the Judiciary, Rep. on B21-0683, the "Comprehensive Youth Justice Amendment Act of 2016," at 3 (Oct. 5, 2016) [hereinafter 2016 Committee Report]). Young people are more vulnerable to "negative influences" and "peer pressure," especially when raised in "unstable, violence-ridden circumstances." *Id.* at 635 (first quoting *Roper v. Simmons*, 543 U.S. 551, 569-70 (2005); and then citing *Miller v. Alabama*, 567 U.S. 460, 471 (2012)). IRAA, accordingly, provides a meaningful opportunity for young offenders—who have inherently "reduced culpability" and "an increased 'capacity for rehabilitation'"—to obtain a reduction in their sentence after serving a portion of

their sentence. *Bishop*, 310 A.3d at 635 (quoting 2016 Committee Report at 4). The text of IRAA itself incorporates this social and scientific reality, referring unconditionally to the "diminished culpability of juveniles and persons under age 25" that results from "immaturity, impetuosity, and failure to appreciate risks and consequences." D.C. Code § 24-403.03(c)(10).

It would invert this logic to say that teenage criminal history should play a substantial role in denying someone IRAA relief. The same biological and social factors underlying Bryant's youth that presumably contributed to his committing second-degree murder just as surely contributed to his prior criminal history. We have stressed this point in our own IRAA precedents. *See Bishop*, 310 A.3d at 646 (recognizing that "transient immaturity" behind the "underlying offense" can also affect "[o]ther crimes committed before the movant turned twenty-five" (internal quotation marks omitted)). The history cited by the trial court dated back to when Bryant was just fourteen years old, and "children who are very young may be inherently less competent and culpable" than older children. *See* 2016 Committee Report at 8.

But the trial court discounted this central command of IRAA when giving hefty weight to Bryant's teenage criminal history. It accepted that circumstances in Bryant's youth and his father's negative influence may have impacted his "choices

regarding drugs and alcohol," but declined to extend that same logic to Bryant's teenage convictions and arrests, which the trial court then turned to heavily rely upon when denying Bryant relief. Indeed, the trial court appeared to weigh Bryant's youth at the time *against* him, reasoning that it was concerned with his "history of criminal conduct amassed prior to his arrest in this matter *despite his relatively young age.*" We get the court's point—it didn't take Bryant long to amass a pretty substantial criminal history—but per IRAA's terms, the force of that point is substantially offset by the mitigating factors of youth. In light of the science and fundamental purpose underlying IRAA, the court gave unsustainable weight to Bryant's teenage criminal history.

As a textual matter, too, IRAA's tenth factor should have put the trial court on notice that an overreliance on Bryant's teenage criminal history was improper. Factor ten says that the trial court "shall consider" "[t]he diminished culpability of juveniles" in its overall analysis of "whether to reduce a term of imprisonment." D.C. Code § 24-403.03(c). This "diminished culpability" language is open-ended and not limited to the trial court's analysis of the underlying offenses of conviction (i.e., not just Bryant's 2002 convictions for second-degree murder and firearm-related crimes). Accordingly, factor ten's logic should have informed the trial court's entire analysis, including its consideration of Bryant's prior offenses under factor two and the dangerousness and interests of justice inquiries.

We acknowledge that "[g]enerally, on review for abuse of discretion, an argument that the trial court 'should have given more weight to factors favorable to [the appellant],'" or less weight to factors unfavorable to them, "is not a basis for reversal." *Long v. United States*, 312 A.3d 1247, 1271 (D.C. 2024) (quoting *Sharps v. United States*, 246 A.3d 1141, 1159 n.90 (D.C. 2021)). We also accept that the text of IRAA's factor two—"the history and characteristics of the defendant"—is broad and provides some textual basis for a trial court to at least consider a movant's criminal history, even during their teen years. *See Bishop*, 310 A.3d at 646 n.11 ("This is not to suggest that evidence of . . . the movant's record of violence before or after the underlying offense [is] wholly irrelevant to an IRAA inquiry."). But treating teenage criminal history as dispositive under factor two—and without recognition of the impact of a movant's youth on that history—cuts against the heart of the statute. To isolate it and weigh it so heavily as the trial court did here inverts the underlying logic of IRAA and risks rendering the statute ineffective. *See Walls v. United States*, No. 24-CO-0321, 2025 WL 2166286, at *5 (D.C. July 31, 2025) (rejecting construction of IRAA that would render the statute "ineffectual in achieving its stated legislative objective").

On a final note, we would be particularly troubled if we read the trial court's order to give any real weight to Bryant's mere arrests and charges that did not result in convictions or their juvenile equivalent, adjudications of "involvement." Bryant

argues that the court abused its discretion by weighing those arrests as cutting against IRAA relief, but that is not how we read the trial court's order. We instead understand the court to have merely catalogued those arrests for completeness's sake when describing Bryant's upbringing and formative years. To avoid any uncertainty on remand, we observe that the District's courts take the presumption of innocence seriously, and mere arrests are not to be taken as any proof of guilt in the IRAA calculus. *Cf.* District of Columbia Voluntary Sentencing Guidelines Manual § 2.2 (Sept. 2023) ("Cases that are dismissed before a judgment of guilt or a sentence is imposed are not scored" within criminal history calculation for purposes of typical sentencing); *United States v. Torres-Meléndez*, 28 F.4th 339, 341-42 (1st Cir. 2022) (discussing problems with considering prior arrests during federal sentencing process because "proof only of an arrest is *no* proof of guilt") (internal quotation marks omitted)).

### D. Bryant's remaining arguments

Bryant further argues that the trial court gave excessive weight to (1) a 2011 disciplinary infraction for attempting to traffic heroin into the prison, and (2) his repeated descriptions of his murder offense as an "accident." We see Bryant's points—the 2011 infraction, while serious, is now more than fourteen years old and was non-violent, so it may not be an especially potent piece of evidence that Bryant

remains dangerous. And the word "accident" seems to us like a colloquial word that reasonable laypersons (like Bryant) might use to describe an unintended killing, even if committed with criminal recklessness. We stop short of saying that the trial court erred in either respect, however. Given that we are remanding the case in light of the errors noted above, we simply invite the trial court to reassess the weight it gives to each of these factors on remand.

### E. These errors were not harmless

The government's principal counterpoint is that even if the trial court committed any or all of the above errors, the errors were harmless. *See Doe*, 333 A.3d at 912 (affirming IRAA judgment where errors did not cause "significant prejudice" (quoting *Johnson*, 398 A.2d at 366)). The government stresses that the trial court was most concerned with factors disconnected from Bryant's primary complaints, namely, his prior criminal convictions and his 2011 infraction for trafficking in heroin. We are not sufficiently confident that the trial court's errors did not affect its bottom-line judgment to deny Bryant relief.

Each of the errors we have identified strikes us as potentially critical to the trial court's calculus. In our view, the trial court's failure to account for the strong mitigating force of the third-party attackers who started the underlying affray was a potentially critical omission under IRAA's ninth factor. While we do not opine on

how heavily Bryant's sexual abuse as a child should factor in his favor under IRAA's second or eighth factors, the unaccounted-for fact of it directly undermines the trial court's judgment that Bryant had a "pleasant" childhood free of any sexual abuse. And the trial court weighed Bryant's criminal history as a teenager so heavily that we cannot confidently say it did not impact its decision to deny IRAA relief (the government concedes that this history featured prominently in the court's bottom line to deny relief).  In combination, these errors have shaken our confidence that the trial court would have reached the same result had it not made them, so that it should now reconsider its ruling.

### III. Conclusion

We vacate the trial court's order and remand this case for further proceedings consistent with this opinion.

*So ordered.*